[No. 41887.   En Banc.   December 16, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. SANDRA K. STILTNER, *Appellant*.

48

*Ted Roy* (of *Hovis, Cockrill & Roy*), for appellant.

*Lincoln E. Shropshire, Prosecuting Attorney, Patrick H. Olwell,* and *David K. Crossland, Deputies,* for respondent.

SHARP, J.—The most important question presented by this appeal is whether the defendant, who was convicted of grand larceny by embezzlement, was denied a fair and impartial trial by the publicity that preceded her trial. While the conviction was set aside by the trial judge for other reasons, the Court of Appeals, by a divided court, reinstated the verdict against her.

The facts are summarized in detail in the Court of Appeals majority and dissenting opinions, reported in *State v. Stiltner,* 4 Wn. App. 33, 479 P.2d 103 (1971). Briefly, the case involves funds missing from the registry of the Yakima Justice Court. The shortage was discovered by an examiner for the State Auditor and in due course defendant was charged with grand larceny by embezzlement, and with second-degree forgery by "making a false entry on a public record or account." The forgery count was dismissed at the conclusion of the trial. After a verdict of guilty on the larceny count, the trial court granted defendant's motion in arrest of judgment and dismissed the case. The state appealed to the Court of Appeals assigning error to the dismissal of the forgery count and to the order in arrest of judgment. The defendant cross-appealed, in the alternative only, from a pretrial order denying her motion for change of venue. The Court of Appeals reinstated the

verdict of the jury and ordered judgment thereon. A dissenting opinion, while agreeing with the majority that there was substantial evidence to support all of the elements of the crime charged and therefore that the judgment should not have been arrested on that basis, urged that defendant be granted a new trial in a more neutral location. We also are concerned with the atmosphere in which this trial was held.

The trial court (a different trial judge sitting than the judge who later tried the case) in denying a pretrial motion for change of venue presented some 3 months prior to trial, entered findings of fact and conclusions of law. The findings relevant to the issue before us are as follows:

Finding of fact 1:

That the Yakima Herald Republic is the only daily newspaper within the County of Yakima and has sufficient general circulation throughout the County to apprise the citizens of Yakima County of its contents.

Finding of fact 2:

That on September 26, 1968, on the front page of the Yakima Herald Republic appeared a news article captioned "Payment ordered on Court shortages", a part of which read as follows:

"Sums demanded by Carrier from the following were $1,036.45 from Thomas E. Grady, Jr., Justice of Peace Court No. 1; $707.20 from George H. Mullins, Justice of Peace Court No. 2; and clerks, $659.25 from Janice P. Carlson; $707.20 from Gladys Keller; $1,743.65 from Sandra K. Stiltner; $505.05 from Sandra L. Hyde, and $1,333.95 from Jeanette M. Graves.
"Four of the clerks, Mrs. Carlson, Mrs. Keller, Mrs. Graves and Miss Hyde, have voluntarily taken polygraph tests, said Shropshire.
" 'All four of these clerks have been cleared by the polygraph tests of any knowledge of the shortages,' said Shropshire."

Finding of fact 3:

That thereafter on September 28, 1968, on the front page of the Yakima Herald Republic appeared the news

article entitled "Justice of the Peace denies shortage" reading in part as follows:

"County Prosecutor Lincoln Shropshire said Friday that he had understood that four of five women employees mentioned in the state examiner's report had taken polygraph tests voluntarily.

"Shropshire said that 'four of the clerks involved had volunteered to take the polygraph, but that only three of them had actually submitted to the tests thus far.'

" 'The three who have taken the tests were found innocent of knowledge of the shortages,' he said, 'and the fourth, whom I thought already had taken the test, is scheduled to take it voluntarily on Monday.'

"The polygraph tests and Judge Mullins correspondence all relate to an investigation into a state examiner's report issued July 25 reporting shortages in funds of salaried Justice Court in Yakima. The attorney general's office has demanded various sums from bonding companies, the Justices of the Peace and of clerks either now working or who previously worked in the court offices."

That on January 23, 1969, there appeared in the Yakima Herald Republic in a news article captioned "Two charges filed against ex-clerk" reading in part as follows:

"Besides Mrs. Stiltner, there were four other clerks who have worked in the Justice Courts records office for Justices Thomas E. Grady Jr. and George Mullins.

"Yakima County Prosecutor Lincoln E. Shropshire said Friday that he had mailed on Dec. 31, 1968, letters to each of the four other clerks who were noted in the examiner's special report.

"The letters went to Mrs. Sandra L. Hyde, Mrs. Jeannette M. Graves, Mrs. Janice P. Carlson and Mrs. Gladys Keller.

"Each letter had the same wording except as to dates.

"Shropshire explained to each woman how they had appeared before a polygraph examiner in Yakima for 'lie detector' tests. 'At the conclusion of this examination he (the examiner) expressed the opinion that you were not involved in either the theft or the falsification of records,' the prosecutor wrote to each of the four women. "Shropshire also noted in the letters that handwriting specimens had been sent for examination to an

Oregon expert. 'He concluded that the handwriting appearing on the falsified records of Yakima Justice Court, Department No. 1 and 2, was not the same handwriting as yours,' he advised each of the four women.

" 'The foregoing conclusions when coupled with other surrounding circumstances seem to indicate that you were not involved in either the theft of funds from Yakima County Justice Court, Departments No. 1 and 2 or the falsification of records,' the prosecutor added. "The prosecutor's office said the letters absolving Mrs. Hyde, Mrs. Carlson, Mrs. Graves and Mrs. Keller of blame were written because 'each of the women hold responsible jobs' and need the clearance in order to obtain surety bonds."

The record discloses more on this issue. In addition to the articles set forth in the findings, the community was exposed to numerous other articles and television and radio releases as the investigation proceeded. The purport of this publicity was to assure the public that the mystery of the missing funds had been solved and the guilt determined.

The defendant was a long-time resident of the Yakima area, having completed her schooling there and having worked in the justice court for many years. While she did resign her position with the court prior to the trial, this was due to ill health rather than to the threat of prosecution, as implied by one of the articles. And in publicizing the cooperation of the other four clerks in submitting to the lie detector, the publicity did not disclose that the defendant's refusal to submit was upon advice of counsel, who very properly refused to agree to the prosecutor's condition that the results of the test would be admitted as evidence in the trial. *State v. Rowe*, 77 Wn.2d 955, 468 P.2d 1000 (1970). In short, we find that this defendant was brought to trial in a community in which she was well known, and which had been fully advised that four out of the only five possible suspects had been cleared by scientific methods employed by the state's criminal science experts. As the deputy prosecutor arguing the case before us candidly admitted:

> Parenthetically, we are not proud nor do we condone the publicity that was given in this particular case. We see the error in it and would submit that this should not happen again, nor will it.

Nor did he question the obvious effect of this publicity:

> I can't disagree with Your Honors that these particular newspaper releases as they were worded narrowed it down to one person.

■ The trial court, in passing upon the motion for change of venue, found that the quoted news releases were contrary to the Guidelines and Principles for the Reporting of Criminal Proceedings compiled and promulgated for all law enforcement officers and news media by the Bench-Bar-Press Committee of the State of Washington, which guidelines discourage the reporting of results of investigative procedures, lie detector tests or handwriting samples. However, in denying change of venue, he based his conclusion on the fact that "the said guidelines do not have the force of law." This is correct, insofar as they are voluntary and neither legislatively mandated nor promulgated by rule of court. That is not to say, however, that particular violations may not also be due process violations in certain instances.[1]

■ But courts, including this court, have been most reluctant to disturb the trial courts' discretion to decide motions for change of venue. We stated the rule in *State v. Malone*, 75 Wn.2d 612, 614, 452 P.2d 963 (1969), as follows:

> A motion for a change of venue in a criminal case is directed to the sound discretion of the trial court, and its decision with respect thereto will not be disturbed on appeal, absent a convincing showing of an abuse of discretion. *State v. Hawkins*, 70 Wn.2d 697, 425 P.2d 390 (1967).

---

[1]It must be made clear that the ultimate constitutional responsibility for guaranteeing a fair and impartial trial lies primarily with the judiciary, not the press. Here, the astonishing fact is that the prejudicial material publicized was not the result of overzealous news gathering and reporting, but was actually released to the news media by the state.

However, in exercising their discretion, trial courts must recognize this court's commitment to the principle that the right to a trial by jury includes the right to an unbiased and unprejudiced jury, and that a trial by jury, one or more of whose members is biased or prejudiced, is not a constitutional trial. *State v. Parnell,* 77 Wn.2d 503, 463 P.2d 134 (1969). We have always insisted that a guarantee of a speedy and public trial by an impartial jury under Const. art. 1, § 22, both before and after its change by the Tenth Amendment, means a fair trial. As we stated in *State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956), at 71:

> "Fair trial" certainly implies a trial in which the attorney representing the state does not throw the prestige of his public office, information from its records, and the expression of his own belief of guilt into the scales against the accused. See *State v. Susan* (1929), 152 Wash. 365, 278 Pac. 149.

We have had occasion to predicate error upon the refusal of a trial court to grant a motion for change of venue where we could not escape the conclusion that such was necessary to effectuate the defendant's guarantee of a fair and impartial trial. *State v. Hillman,* 42 Wash. 615, 85 P. 63 (1906). In recent decisions on point (*State v. Malone, supra,* and *State v. Valenzuela,* 75 Wn.2d 876, 454 P.2d 199 (1969)), we upheld the denials of motions for change of venue based upon a prior televised 2 or 2½ minute film of a narcotics raid conducted by the Yakima County Sheriff's Department. We did not condone the publicity and noted in *State v. Malone, supra* at 614, that "inhering in such a procedure is the very real risk that innocent persons may be wronged and guilty persons released from punishment by virtue of the potential prejudice the practice could beget." However, we were unable to find an abuse of discretion in denial of the motion for change of venue since the defendant pointed to nothing that transpired during the telecasts that would indicate that he was in anywise prejudiced.

Likewise, in *State v. Valenzuela, supra* at 878, we noted that "Only a fleeting glimpse of defendant could be identi-

fied in the film as the suspects passed in the camera's view" on KNDO, and on KIMA, "Valenzuela, . . . was shown. His face was not shown. It was from his neck down." In the course of that opinion, we alluded, at page 881, to one aspect of the publicity which is present in the instant case but was lacking there, as follows:

> [T]he television news coverage was not of an inflammatory nature and the film strips and narration in the broadcast *did not focus entirely on defendant.* When defendant was shown, he was shown as one of a group of several suspects apprehended and *no effort was made to single him out for special mention.*

(Italics ours.)

■ In the instant case, the trial judge who actually handled the trial apparently felt that he was bound by the previous order denying change of venue, unless trial counsel unearthed actual prejudice in the voir dire examination of prospective jurors. As he stated at the commencement of the trial, in his denial of the renewed motion for change of venue:

> I feel that where a full hearing has been had on that that the second court, the second department of the court should follow the findings and conclusions of the first with this caveat, however, that if the voir dire does disclose that in fact it is prejudicial, then that this court is ruling upon new matter, matter not previously ruled upon and should rule upon it then as an original proposition.

But this ignores the constitutional principle that a denial of due process in cases involving the publicity of criminal matters may be found even without an affirmative showing of actual prejudice. Indeed, where the circumstances involve a probability that prejudice will result, it is to be deemed inherently lacking in due process. *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966); *Estes v. Texas,* 381 U.S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965). It is apparent in this case that there existed a high probability of prejudice. The trial judge

himself noted the difficulties inherent in any rule requiring an affirmative showing of actual prejudice:

> Now this court recognizes the dilemma that Mr. Roy is put in in this matter and should comment, it seems to me, at this point. He is in a position where he must ask a juror whether or not he remembers a certain thing that he doesn't want him to remember and by doing so he may quicken or refresh that memory as to a newspaper article that may otherwise have been forgotten.

From our independent review of the record, we find that the probability of prejudice is so apparent that it was error not to grant the motion for a change of venue.

Two further issues require discussion. The state appealed the trial court's dismissal of the second-degree forgery charge, but both the trial court and the Court of Appeals found that the document involved was not a public record or account and thus a charge of making a false entry on such a record could not stand. We agree with this conclusion.

The state also challenged the trial court's granting of defendant's motion in arrest of judgment and dismissal of the larceny charge. The trial court granted that motion on the basis that the evidence, though consistent with guilt, was not inconsistent with innocence, declaring that the evidence did not meet the standards required of a circumstantial evidence case. The Court of Appeals disagreed, and so do we. Under the standards concerning motions for arrest of judgment which we recently promulgated in *State v. Randecker*, 79 Wn.2d 512, 487 P.2d 1295 (1971), a trial court, after a jury verdict has been rendered, may only determine whether there was "substantial evidence" tending to support all necessary elements of the crime. The record shows that this standard was met, and accordingly the trial court erred in setting aside the verdict and entering judgment of dismissal.

We conclude that even though there may be sufficient evidence to support a jury verdict, the case should not be tried in Yakima County. Accordingly, the case is remanded

to the trial court with direction to order change of venue to a more appropriate locale.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur.

FINLEY, J. (concurring)—I have signed and concur in the majority opinion. However, I have substantial reservations as to the substance and implications of footnote 1 of the majority opinion which reads as follows:

> It must be made clear that the ultimate constitutional responsibility for guaranteeing a fair and impartial trial lies primarily with the judiciary, not the press. Here, the astonishing fact is that the prejudicial material publicized was not the result of overzealous news gathering and reporting, but was actually released to the news media by the state.

While in some contexts it may be said that "the ultimate constitutional responsibility for guaranteeing a fair and impartial trial lies primarily with the judiciary, not the press," the statement is a generalization I cannot accept in relation to fair trial—free press problems without some further explanation and, I think, appropriate qualification. In other words, when a defendant in the trial of a particular criminal case asserts as a defense that news reporting regarding pretrial matters prejudiced his right to a fair trial, it then, of course, can be said that "the ultimate constitutional responsibility for guaranteeing a fair and impartial trial lies primarily with the judiciary, not the press." At this stage of the proceedings, evaluation of the problem then raised, and a decision as to whether prejudice exists and a change of venue must be granted is unquestionably the responsibility of the trial judge, and is exclusively a judicial function in the indicated context. However, at a very early point in the history of our Voluntary, Cooperative Washington Bench-Bar-Press Program, it was recognized—and it became an underlying tenet of the program —that the responsibility is a joint and several one on the part of the bench, the bar, the press, and law enforcement personnel regarding that kind or manner of news reporting

of pretrial and trial proceedings which would be likely to result in prejudicing the rights of a defendant to a fair and impartial constitutional-due process trial. Thus, responsibility for the news reporting—which, in the instant case, this court holds was prejudicial to the rights of the defendant and requires a change of venue—was a joint and several responsibility, to be recognized, and assumed at least in part—if not entirely—both by the prosecutor's office as well as by the press.

As emphasized in the majority opinion, the deputy prosecutor arguing this case before us candidly admitted:

> Parenthetically, we are not proud nor do we condone the publicity that was given in this particular case. We see the error in it and would submit that this should not happen again, nor will it.

I daresay the prosecutor's office was aware of the decision in *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966), and its implications. Furthermore, I daresay that office was aware of the Washington Bench-Bar-Press Program and its efforts to guard against news reporting likely to prejudice the rights of an accused to a fair trial. However, consistent with the underlying precepts or basic philosophy of the Bench-Bar-Press Program, it will not do to place the blame for the resulting prejudice to the defendant's right to a fair trial and the change of venue in this case totally upon the prosecuting attorney's office.

It is a most significant, basic principle of our Voluntary, Cooperative Bench-Bar-Press Program that the press is entitled to information—in fact, to rather unrestricted access to information—but thereupon a responsibility devolves upon the press to exercise sound editorial judgment and journalistic responsibility under the Guidelines of the Bench-Bar-Press Program to avoid unnecessary prejudice to the rights of a criminal defendant to a fair and impartial trial. While the public relations activity of the prosecutor cannot be condoned, nevertheless, I think it must be very clearly stated, emphasized, and understood that in the instant case the responsibility for what happened should not

be placed solely on the doorstep of the prosecuting attorney of Yakima County. The fault must be shared by the Yakima Herald Republic, unless it can be said that under (a) the Guidelines of the Bench-Bar-Press Program, and (b) the circumstances involved, *freedom of the press* and *the interest of the public in being informed* (*i.e.,* knowing about the matters contained in the news stories and emphasized by this court in granting a new trial and a change of venue), *were so supervening and so nearly absolute as to justify the publicity and the news reporting in this criminal case despite the potential prejudicial effect* on the rights of the defendant to a fair and impartial trial in the truest constitutional sense. I am convinced this could hardly be said of the situation involved in this case.

Perhaps it is comparable to "Monday morning quarterbacking," but considering (a) the evaluation by this court of the news reporting problem involved, and (b) the action of this court in granting a change of venue, I think the propriety of the judgment exercised by both the prosecutor's office and the news media was extremely dubious, to say the least. Furthermore, I am convinced that *the joint and several responsibility of all concerned* (contemplated by our Bench-Bar-Press Program) was simply overlooked or disregarded—jointly and severally—by all concerned. The end result was the prejudicial publicity which has become the crucial factor in granting a new trial, *and a change of venue* in this criminal appeal.

HUNTER, NEILL, STAFFORD, and WRIGHT, JJ., concur with FINLEY, J.