[No. 1964-2.   Division Two.   November 5, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES GILBERT WILSON, *Appellant*.

*Edward G. Holm* and *Mooney, Cullen & Holm,* for appellant (appointed counsel for appeal).

*Byron E. McClanahan, Prosecuting Attorney for Mason County,* for respondent.

PETRIE, C.J.—At 8:45 a.m. on March 6, 1975, 8-year-old Janet Kleiner left her home in Lacey, Washington, intending to walk to school some four or five blocks away. She never arrived. Within an hour she was abducted, raped, sodomized, and murdered. Her body was found the next day, some 8 miles from school, hanging from the limb of a tree, one end of a dog leash looped around her neck and the other end tied to the limb.

The autopsy surgeon testified that "death was due to strangulation, the actual mode of dying being asphyxia." He summarized his examination of the genital area as follows:

> The back or lower half [of the vagina] was completely hemorrhagic, black and blue, and very swollen, and immediately below it is the rectum, and in her case the rectum, instead of being normally closed, was dilated nearly two inches wide open with the membrane between the rectum and the vagina torn and completely hemorrhagic, and, as I said, the fecal material within the rectum was pushed or rammed so to speak back up into the rectum, which could only be from a penetration from the outside. The rupture of the muscle indicating that it was done suddenly and with force. In other words, it was pushed very rapidly with great stretching which ruptured the muscle fibers, very characteristic of rape.

On March 11, the defendant, James G. Wilson, was arrested by his parole officer. The next day Mr. Wilson told James R. Land, Chief of the Lacey Police Department, how he had abducted, murdered, and sexually assaulted the

young girl while she repeatedly invoked the name of Jesus.

In a four count information, Mr. Wilson was charged with the crimes of abduction, rape, sodomy, and first-degree murder. After conviction by a jury on all four counts, he was sentenced to two life terms and to maximum terms of 10 and 20 years, all to run consecutively.

In his appeal to this court, he contends he was denied a fair trial. Specifically, he asserts the trial court erred by denying his several motions (1) to change venue to another county, (2) to examine each prospective juror out of the presence of other prospective jurors, (3) to grant additional peremptory challenges of the jurors, (4) to grant a new trial because of prosecutorial misconduct at the closing argument, and (5) to suppress evidence of his confession. Upon review of the record, we affirm the judgment and sentence entered by the trial court.

## CHANGE OF VENUE

Defendant's motion for a change of venue is based upon an assertion that pretrial publicity deprived him of a fair and impartial trial in Thurston County. He contends that news accounts of Janet's disappearance and death, of his subsequent arrest, and of several ancillary events associated with the crime contributed to a community atmosphere which deprived him of a constitutionally guaranteed fair trial by unprejudiced and unbiased jurors.

When a defendant in a criminal matter demonstrates that pretrial publicity results in actual prejudice or a reasonable probability of prejudice he is entitled to a change of venue. *State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971). The trial court's resolution of the issue will not be overturned on appeal, absent a convincing showing of an abuse of discretion. *State v. Malone*, 75 Wn.2d 612, 452 P.2d 963 (1969). Nevertheless, when the appellate court's independent review of the record reveals a manifestly apparent probability of prejudice, a denial of a motion for change of venue will be reversed. *State v. Stiltner, supra; State v. Warwick*, 16 Wn. App. 205, 555 P.2d 1386 (1976).

In the case at bench, we have reviewed the record and do not find a manifestly apparent probability of prejudice.

Publicity on the case was both massive and extensive, including publication of banner headlines in red ink and an old "mug shot" of the defendant. However, as acknowledged by defendant's counsel at oral argument, media accounts of the events preceding trial were accurate. The record reflects, with one quickly corrected exception, that law enforcement officials deliberately tried to repress dissemination of the repulsive nature of the crimes until presentation of evidence at trial. Gruesome details of the crime were not reported. On one occasion a radio station reported that a sheriff's inspector categorized the murder as "the worst crime in Thurston County history." This report was followed, however, by a series of statements, attributed to the same inspector, discounting reports of sexual assault, saying they were *not* confirmed. No news accounts revealed the sodomous nature of the assault or the revolting details of the autopsy report. Nor did they reveal the Federal Bureau of Investigation's reports which established that pubic hair found in the victim's pubic and anal regions exhibited the same microscopic characteristics as a known sample of Mr. Wilson's pubic hair.

Many of the news accounts referred to the fact that Mr. Wilson had been paroled following a conviction in 1972 of carnal knowledge of a 12-year-old girl. Unless the defendant chose to testify in his own behalf, such evidence would not normally be presented at trial to the jury.[1] In addition, the self-disqualification by the Thurston County Prosecutor, and the subsequent appointment of an official from another county to prosecute the case, provided another

---

[1] In addition to the prior conviction for carnal knowledge committed in 1971, Mr. Wilson apparently had been a patient at Western State Hospital from 1961 to 1966 as a result of a reported sex molestation of a 5-year-old girl. Media accounts did not report this fact. Nor did the prosecution attempt to present evidence of these prior crimes during its case in chief under any conceivable theory that proof of these facts tended to establish a necessary element of the crime charged. *See State v. Bloomstrom*, 12 Wn. App. 416, 529 P.2d 1124 (1974).

flurry of news coverage, with repeated emphasis on the defendant's prior conviction.

Guideline No. 3 of Guidelines for the Reporting of Criminal Proceedings adopted by the Bench-Bar-Press Committee of the State of Washington under a voluntary, cooperative bench-bar-press program provides:

> *Prior criminal charges and convictions are matters of public record* and are available to the news media through police agencies or court clerks. Law enforcement agencies should make such information available to the news media after a legitimate inquiry. *The public disclosure of this information by the news media may be highly prejudicial* without any significant addition to the public's need to be informed. The publication of such information should be carefully reviewed.

(Italics ours.)

The senior trial judge who presided at this trial fully appreciated the "highly prejudicial" potential created by the repeated dissemination of the fact of Mr. Wilson's prior conviction. In an attempt to eradicate any possible prejudice the trial court granted an extraordinary number of defendant's "for cause" challenges to potential jurors. Obviously, during voir dire examination of the jurors, the court permitted no specific reference to Mr. Wilson's prior conviction. However, all prospective jurors who indicated they had been exposed to news accounts of the crime[2] were asked whether or not they had any knowledge of the defendant's background or history. All jurors who expressed such knowledge were excused for cause, either in open court after they indicated they had formed an opinion in the case or expressed a preference not to be a juror, or in chambers after they revealed, under segregated voir dire examination, their knowledge of the defendant's prior conviction.

Additional potential for prejudice may have arisen be-

---

[2] Two jurors, who were ultimately accepted by the defense, were out of the state when publicity was heaviest. They reported no exposure to news articles describing the crime or any of the associated events. All the other prospective jurors acknowledged some exposure to pretrial publicity.

cause some news accounts reported that the defendant's 17-year-old "girl friend" was also arrested and detained as a material witness, but was subsequently released. Other stories indicated that Mr. Wilson was arrested after he voluntarily contacted his parole officer because a vehicle resembling his girl friend's car was reportedly seen in the vicinity where Janet's body was found. None of the stories recited that Mr. Wilson and his girl friend had been living together for approximately 7 months. Nor did the articles report that the day on which Janet Kleiner disappeared, Mr. Wilson, accompanied by his girl friend, twice visited the Evergreen Valley area, where Janet's body was ultimately found, in search of the dog leash which the girl friend's parents had given them the previous day. The defendant, who was away from home from 7 p.m. March 5 until 10:30 a.m. the next day drinking beer and taking several "hits of speed," told his girl friend that he struck a dog with the car he was driving and used the leash to drag the dog off the road. After his arrest, the defendant told the police that he used this leash to hang the child. News accounts carried no word of this admission or of any other indication that Mr. Wilson had confessed to the abduction, murder, or sexual assaults.

The defendant directs our attention to the contemporaneous efforts of several school districts to encourage immediate parental reporting of school absences of their children in order that school officials might be alerted to untoward absences. Several districts did circularize residents in their respective areas, and news accounts of such efforts were reported by the media, following the discovery of the victim's body. Those efforts were undoubtedly occasioned by and focused on the crime, but none of them focused upon the man charged with having committed the crime.

In view of the heinous nature of the atrocities committed, an extensive news coverage was to be expected. Not only were the events reported by the Thurston County media, but also by media in Tacoma and Seattle. It is a credit to the responsible press representatives and to the local and

county law enforcement officials that news stories contained factually accurate material of a relatively nonsensational nature and, for the most part, told the public (prior to trial) only those basically essential facts of the crimes which would ultimately be presented to the jurors in the controlled atmosphere of the courtroom.

We find neither a manifest abuse of discretion nor a manifestly apparent probability of prejudice. The trial court's denial of the defendant's motion for change of venue was not error.

### VOIR DIRE EXAMINATION OF JURORS

The defendant contends that the trial court erred by not permitting segregated voir dire examination of each juror who had been exposed to news coverage of the crime. We have already noted that whenever a juror indicated knowledge of the defendant's background or history, the juror was either immediately excused or examined out of the presence of the other jurors. All jurors who evidenced knowledge of the defendant's background or history were excused regardless of how they acquired such knowledge or what that knowledge was. *See State v. St. Peter*, 63 Wn.2d 495, 387 P.2d 937 (1963).

The thrust of defendant's contention, however, is that the segregated examination of the jurors should have occurred *before* inquiry as to each individual juror's knowledge. Indeed, the defendant points out that by the precise nature of the sometimes bifurcated manner of conducting the voir dire examination, each juror surely learned that the defendant's background or history contained some prejudicial facts, because every juror who indicated a knowledge of defendant's background was excused in court or taken into chambers and excused.

There is some support for the defendant's contention that prospective jurors should have been isolated from the entire voir dire examination of other prospective jurors. Section 3.4(a) of the American Bar Association's *Standards*

*Relating to Fair Trial and Free Press* (Approved Draft, 1968) suggests a method of examination as follows:

> Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

In this jurisdiction, the right of an accused to carefully examine prospective jurors on voir dire is enforced to an extent necessary to grant him every reasonable protection. *State v. Hunter*, 183 Wash. 143, 48 P.2d 262 (1935). The purpose of the inquiry is to enable each party to learn the state of mind of the prospective jurors, so that he can know whether or not any of them may be subject to challenge for cause, and determine the advisability of interposing a peremptory challenge. *State v. Tharp*, 42 Wn.2d 494, 256 P.2d 482 (1953). The limits and extent of voir dire examination—and thus the determination of whether or not an accused has been granted every reasonable protection—lie within the discretion of the trial court, and it has considerable latitude. *State v. Robinson*, 75 Wn.2d 230, 450 P.2d 180 (1969).

In the case at bench, the trial court exercised meticulous care to insure, within reasonable bounds, that the jury which was ultimately selected began its duties with an open mind. The leniency with which the court granted challenges for cause, and the caution exercised by the court in distinguishing prior knowledge which focused on the defendant from prior knowledge of the other events associated with the crime, demonstrated a keen sensitivity to

the need for preserving the constitutional protection of a trial by an impartial jury.

Upon review of the voir dire examination, and particularly the responses by the jurors ultimately selected, we believe the defendant was tried by a fair and impartial jury. There was no abuse of discretion in the trial court's refusal to grant the defendant's additional request that each talesman's entire voir dire examination be conducted out of the presence of the others.

## ADDITIONAL PEREMPTORY CHALLENGES

The defendant suggests that the extensive pretrial publicity warranted favorable consideration of a request for additional peremptory challenges. There is no constitutional right to peremptory challenges. *State v. Persinger*, 62 Wn.2d 362, 382 P.2d 497 (1963). Nevertheless, court rule provides a limited number of them. CrR 6.4(e)(1) provides in part:

> In prosecutions for capital offenses the defense and the state may challenge peremptorily twelve jurors each; in prosecution for offenses punishable by imprisonment in a penitentiary six jurors each; . . .

As a matter of actual count, 71 prospective jurors were seated and examined; 13 were challenged peremptorily; 13 (including an alternate who was dismissed prior to the jury's deliberation) were chosen to try the issues; and 45 were excused for one cause or another. In *State v. Haga*, 13 Wn. App. 630, 536 P.2d 648 (1975), the court held that for purposes of determining the number of peremptory challenges, first-degree murder is not a "capital offense" unless punishable by death. *See also State v. Johnston*, 83 Wash. 1, 144 P. 944 (1914). At the time of the commission of these crimes Washington had no valid statutory provision for imposition of the death penalty.

We find no error in the trial court's denial of defendant's request for additional peremptory challenges.

## PROSECUTORIAL MISCONDUCT

The defendant contends that the prosecutor's closing argument inflamed the jury and erroneously injected the

prosecutor's personal beliefs as to the defendant's guilt to the extent that he was deprived of a fair trial.

We need not set forth in full the allegedly inflammatory remarks of the prosecutor. It is sufficient to declare that he referred to the victim as "that little angel" and to the defendant by a declaration, "to call him a beast would insult the entire animal kingdom." Further, the prosecutor prefaced several arguments by declaring, "I don't think you can find," or "I say that a confession is stronger than all the proof you can get," or "I say that he is not fit to be a member of the human race."

After reviewing the record as a whole, we are compelled to note that even the most temperate recitation of the stark facts in the case at bench would tend to inflame the most winsome and objectively oriented personality. Nevertheless, we do not condone derisively epithetical references to any defendant; nor do we countenance the prosecutor's expression of personal belief. Although we find some of the prosecutor's remarks improper, we do not find that there was any substantial likelihood that those remarks affected the jury's verdict. Hence, we find no reversible error. *State v. Music*, 79 Wn.2d 699, 489 P.2d 159 (1971).

### DEFENDANT'S CONFESSION

Undoubtedly, the most damaging evidence presented to the jury was the defendant's 14-page typewritten confession, on each page of which he affixed his signature. He contends the written confession and the oral recitation of it by those to whom he related it should have been suppressed because it was obtained after he had been illegally arrested.

At a CrR 3.5 hearing, the court specifically found that Mr. Wilson was arrested and taken into custody on March 11, 1975, by his parole officer for the crime of contributing to the delinquency of minors, *i.e.*, furnishing marijuana to two juveniles. The defendant does not challenge this finding, and there is certainly substantial evidence to support it. Nor does the defendant challenge the voluntariness of

the confession. Nevertheless, the defendant insists that his arrest on a parole violation was merely a ruse; that he was really arrested because he was a suspect in the Janet Kleiner murder case, but the police lacked probable cause to arrest him for that crime.

■ For purposes of this opinion we will assume, without deciding, that Mr. Wilson was a suspect in the murder investigation and that the police did not have probable cause to arrest him for that crime when he was actually arrested. A parole officer may arrest or cause the arrest and detention of a parolee whenever he has reason to believe a convicted person has breached a condition of his parole or violated the law of the state. RCW 9.95.120.

Mr. Wilson's parole officer testified at the suppression hearing that prior to the arrest he examined written statements signed by two persons, reciting that Mr. Wilson had provided marijuana to them; that he knew Mr. Wilson had previously been arrested by Olympia police for possession of a controlled substance; and that he knew criminal proceedings on that charge were pending against Mr. Wilson. The parole officer most certainly had reason to believe, and he testified that he did believe, that Mr. Wilson violated the conditions of his parole. Mr. Wilson's arrest, therefore, was lawful.

We have previously held that, even though the announced basis for an arrest proves to be ill-founded, when a defendant could have been lawfully arrested for another crime, a search incident to the arrest is permissible. *State v. Hartnell*, 15 Wn. App. 410, 550 P.2d 63 (1976). Although (as we have hypothecated) Mr. Wilson could not have been lawfully arrested for the Kleiner girl's murder at the time he was arrested, his post-arrest confession, voluntarily presented to the police, was not subject to suppression so long as there was another valid basis for his arrest.

We find no error in the trial court's denial of the defendant's motion to suppress his confession.

Judgment affirmed.

Pearson and Reed, JJ., concur.

Petition for rehearing denied December 16, 1976.