[No. 2655-2. Division Two. May 12, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. GREGORY L. BROOKS, *Appellant.*

*William L. Dowell,* for appellant.

*Henry Dunn, Prosecuting Attorney,* and *James E. Warme, Deputy,* for respondent.

SOULE, J.—Defendant was charged with, and convicted of, murder in the first degree. He appeals.

The assignments of error present three groups of issues. (1) Should a change of venue have been granted because of pretrial publicity and community attitude? (2) Was evidence of other crimes and misconduct improperly admitted to the defendant's prejudice? (3) Should a new trial have been granted because of police and prosecutorial conduct, the cumulative effect of which allegedly prevented the defendant from receiving a fair trial and substantial justice?

This was not a routine murder. Defendant was not present at the shooting of the victim, D. J. Lykin. The deed was actually done by Kevin Grendon, assisted by Bruce Brant, both of whom were witnesses for the prosecution. Their testimony, along with that of Anthony Smith, is sufficient to support a finding that the defendant did solicit and encourage the killing even without the other evidence presented. The defendant's testimony contradicted that of the State's witnesses on the critical issue of the solicitation.

The actual killing took place on March 4, 1976, in a remote wooded area of Cowlitz County. The body was left unburied in the brush. By defendant's own testimony, he later went with Grendon to look for the body for the purpose of removing any identifying papers, but they could not

find the site. Later, defendant, Grendon and Brant, were successful in locating the body, at which time according to the defendant, they not only took the wallet from the corpse, but mutilated it by cutting off the hands and feet with a machete. Defendant admitted cutting off the feet after Brant had removed the hands. The severed parts were thrown into the Toutle River.

One of the feet was discovered in late July. On August 2, a newspaper story appeared concerning the discovery. No suspects were identified at that time. There is evidence that the appearance of the story caused some concern to the defendant and that within 2 or 3 days, he left for Phoenix, Arizona. Investigation by the authorities led to the discovery of the body and the apprehension of Grendon which was reported by the local newspaper on September 15. The story was on the front page accompanied by a photograph of the examination of the body at the scene. The body is not clearly depicted in the exhibit before us. The text of the story makes mention of the mutilation but not in an inflammatory manner.

A short time later, another story appeared noting the apprehension of defendant in Phoenix. It contained a brief paragraph of the alleged facts as understood by the investigating officers. On September 20, the third and last pretrial story appeared on a back page of the paper noting Grendon's arraignment and noting that by information, Brooks was charged with having hired Grendon to kill the victim. The story again mentioned the mutilation:

> However, officers say it is alleged that Grendon shot Lykin to death on March 4, and that Brooks went to the scene about two months later and severed the hands and feet from the body in an apparent effort to make identification more difficult should the remains be found.

The defense moved for a change of venue on October 7. The supporting affidavits were conclusory, but do suggest the possibility of substantial community prejudice. In denying the motion, the trial court noted the recent decision of *State v. Warwick,* 16 Wn. App. 205, 555 P.2d

1386 (1976). Further, but without mentioning *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479 (1974), the trial court opined, as in *Crudup,* that the best test of whether a fair jury could be obtained was to attempt to impanel one at the time of trial. Then, if defendant's fears were demonstrated to be well founded by the difficulty in obtaining jurors, the motion could be presented again.

After the jury was selected, the defendant did renew the motion. In denying it, the court said:

All right, motion to change venue has been denied. The Court finds the voir dire process was fairly exhausted. We accommodated defense counsel by having a portion of the voir dire process in camera by means outside the presence of the total court here and it is this Court's opinion that the voir dire examination did not indicate any prejudice arising out of prior publicity, and, therefore, the motion is denied.

In reviewing for possible error the refusal of a change of venue, the appellate court accords great deference to the discretionary ruling of the trial court, but nevertheless, must independently review the record to determine if the probability of prejudice is so apparent that it would be error not to grant the motion for a change of venue. *State v. Stiltner,* 80 Wn.2d 47, 491 P.2d 1043 (1971).

We have made that examination of the record in the light of the criteria recognized in *State v. Crudup, supra,* and compared the facts before us with those considered in *Stiltner* and *Crudup* and more recently by this court in *State v. Haynes,* 16 Wn. App. 778, 559 P.2d 583 (1977); *State v. Wilson,* 16 Wn. App. 348, 555 P.2d 1375 (1976) and *State v. Warwick, supra.*

Adverting to the *Crudup* criteria, we note:

1. The newspaper stories were commendably factual and not in any way inflammatory. They were well within the Bench–Bar–Press Committee voluntary guidelines.

2. Only three stories appeared in September and one of these was on a back page. There was some radio coverage mentioned by prospective jurors but the defendant has

made no point of it nor of the brief newspaper story appearing on November 5, 1976, which apparently went no further than to note that the trial was to begin on November 8. So far as this record discloses, the November 5 article did not review the alleged facts.

3. The time lapse from the last significant article was 49 days. We note parenthetically that the defendant insisted on a trial within the 60–day limit required by CrR 3.3.

4. Although no great difficulty was encountered in finding jurors, great care was exercised in the selection process. In camera examination was used extensively so that the statements of the potential jurors being examined would not be heard by other jurors. Of those jurors examined who remembered hearing rumors, examination revealed that the details were vague and in many cases did not implicate the defendant. To insure ample opportunity for the defendant to screen out jurors, extra challenges were allowed by agreement of counsel and leave of the court.

5. The familiarity of the jurors with the publicity and the resultant effect on them was not significantly great. The record shows that some of the prospective jurors had no familiarity with the publicity. A number had some memory but retained no details and had formed no fixed conclusion.

6. The defendant did use all of his peremptory challenges. However, we think it indicative of the community attitude that of the 13 jurors excused for cause, only one had preconceived ideas of guilt. The other causes were personal problems, religious convictions or acquaintance with family or friends of the principals.

7. The connection of government officials with the news stories was minimal and appropriate. Unlike *Stiltner,* there were no press releases as such and the statements to the press by investigating officers were factual and not directly accusatory.

8. As was true in the above–mentioned cases, the charge was a severe one, murder in the first degree. In *Wilson,* it was first–degree murder coupled with abduction, sodomy and rape. In *Crudup* and *Haynes,* it was second–degree

murder. In *Warwick*, it was manslaughter, and in *Stiltner*, it was forgery and larceny of public funds by a public employee.

9. The jury was drawn from all of Cowlitz County. In terms of population, Cowlitz County is smaller than Yakima or Thurston but larger than Walla Walla, Grays Harbor or Clallam, the counties involved in the cases to which reference has been made.

On balance, the impact of the publicity on the community in general and on the prospective jurors in particular, appears to have been substantially less than in *Stiltner*, and likewise less than in either the *Wilson* or *Haynes* cases in which the denial of the motion for a change of venue was upheld. The trial judge was satisfied with the impartiality of the jurors selected and the record reveals no significant difficulty in that selection. For this reason, we hold that a probability of prejudice was not demonstrated and we affirm the court's denial of the original and subsequent motions for change of venue.

█ The second group of errors urged by the defendant relates to the introduction of evidence of collateral and, the defendant asserts unrelated crimes. The usual exceptions to the general rule that such evidence must be excluded are that the prosecution may introduce evidence of other crimes to show motive, intent, absence of accident or mistake, a common scheme or plan, or identity. *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950); *State v. Bloomstrom,* 12 Wn. App. 416, 529 P.2d 1124 (1974).

█ In examining the witness, Anthony Smith, the prosecuting attorney elicited testimony from Smith that he and Brooks had been involved in the deliberate burning of a building owned by Brant. No objection was made to this testimony by the defense; and the obvious purpose so far as the prosecution was concerned was to disclose voluntarily to the jury that Smith's testimony may have been affected by the fact that he had been granted immunity from a potential charge of arson in return for testifying in the present case. Not only did the defendant fail to object to

the testimony when offered, but when the defendant took the stand, he, himself, testified concerning the arson. In this posture of the case we believe he is in no position to urge the error. A reading of the record convinces us that the Smith testimony did not force defendant to speak to the subject of arson. *See State v. Baker,* 4 Wn. App. 121, 480 P.2d 778 (1971).

■ Defendant objects to the introduction of evidence, through Grendon, that defendant offered to pay for the killing with drugs. Defendant asserts that this injects another crime into the picture, one for which the defendant was not charged. This evidence was received without objection. Moreover, it was evidence of an integral part of the crime explaining the involvement of both Grendon and defendant. *State v. Niblack,* 74 Wn.2d 200, 443 P.2d 809 (1968); *State v. Thompson,* 17 Wn. App. 639, 564 P.2d 820 (1977).

Defendant complains of the introduction of evidence of threats toward Karen West and Earl Baker. At the outset of the trial, a motion in limine was granted on the matter of threats. No written order was made but initially the court's ruling was as follows: "Okay, we will disallow threats against others, then." In the context of this ruling, there was to be no reference to threats against others in voir dire, opening statement, or direct testimony. However, the court again addressed itself to that matter and apparently modified the ruling somewhat when it said:

> Threats against others will not be brought up in voir dire, opening statement, *and I can't see at this point any reason to bring it up at all, but I will hear from you on that.*

(Italics ours.) The extent of the court's ultimate ruling is therefore somewhat in doubt.

■■ Evidence was thereafter received concerning defendant's offer to kill Baker, if Grendon so desired, as repayment for the Lykin murder. No objection was made to this testimony. However, the failure to object does not preclude the raising of the issue on appeal where *erroneous*

evidence has been offered in violation of an order in limine. *State v. Smith,* 189 Wash. 422, 65 P.2d 1075 (1937). Assuming that this evidence did in fact violate that order in limine, reversal is not required since the evidence was in fact proper. Evidence of a subsequent offer as repayment for the Lykin killing may come in as an additional exception to the rule about independent crimes, if it is sufficiently relevant, to show consciousness of guilt as well as intent. *State v. Messinger,* 8 Wn. App. 829, 509 P.2d 382 (1973).

▋ Insofar as evidence of threats to kill Karen West was concerned, the record discloses that it was the defendant himself who injected this evidence into the case. The prosecution merely made further inquiry on cross–examination concerning a matter which defendant opened up. *State v. Mattox,* 12 Wn. App. 907, 532 P.2d 1194 (1975).

Defendant urges error in permitting the prosecutor to make reference to untraceable guns. The testimony on this matter is set forth below:

Q. Didn't you subsequently ask him to make some guns for you that couldn't be traced?
A. No, sir, I never did.
Q. Well, didn't you know—
MR. BRIDGEWATER: I think I would object at this time.
THE COURT: Sustained.

This is the entire evidence on this matter. There was no prejudice. Only one question was asked. The defendant denied making the request and there was no further inquiry.

We hold that there was no error committed in the handling of any of the collateral offenses of which complaint is made.

▋ The third group of issues relates to asserted misconduct by the prosecuting attorney and the police. The defense charges that the prosecuting attorney deliberately misstated evidence in his closing argument.

In his brief, the defendant asserts:

> The Prosecuting Attorney indicated to the jury that Brooks had told the Smiths that someone else was going to shoot a third party and ". . . that he, Mr. Brooks, would take care of it after that."

Defendant charges that the Smiths' testimony does not support this argument. On the cross–examination of Linda Smith, we find the following:

A. The first time I heard that D. J. was supposed to have taken some money from Greg.

Q. And what else did you hear at that time?

A. He was going to have somebody shoot him.

Q. Did you understand how he was going to have somebody shoot him?

A. No.

Q. You have testified as to what you've heard so far. Didn't you hear anything else, any other plans?

A. That he was going to take care of the rest.

Q. Did he say anything more about that or do you recall anything more about that?

A. No.

Q. Your testimony was that you overheard this; is that correct?

A. Yes.

Q. Did your husband, your then husband, Tony Smith, fill you in or tell you about this, or do you recall, what you are testifying here today about?

A. No, he didn't fill me in.

Q. But all you heard was that he was going to shoot somebody, he was going to shoot D. J. and he was going to take care of the rest, or somebody else was going to shoot D. J. and he would take care of the rest?

A. Yes.

Although the record contains further evidence on the subject, this is sufficient to demonstrate that the prosecutor's argument was supported by the record.

Further prosecutorial misconduct is alleged in defendant's brief as follows:

> The Prosecuting Attorney painted a scenario of the reliability and the step–by–step process of the police deductions and of the process of the investigation. In

fact, there was never any testimony regarding the process by which the police went out and contacted friends of Grendon and Brooks and how they, in fact, did their "homework".

The record discloses that on August 19 the police interviewed Linda and Anthony Smith and received information that Greg Brooks, the defendant, had killed someone. It further reveals that 4 days later, Anthony Smith came to the police and reported that he had heard that Kevin Grendon had done the shooting.

It also shows that on September 14, before the police actually knew who did the killing, they contacted Bruce Brant and offered him immunity. At that time the police did not have Bruce Brant as a suspect in the homicide but he was a suspect in the arson of his own home and it was for that reason that the police contacted him. In our opinion, this police activity can be properly described as "doing their homework."

The defendant asserts that the prosecuting attorney misstated the evidence in his final argument, when in effect he said that five witnesses were telling exactly the same story, namely, that it was the defendant who put Grendon and Brant up to the act. The defendant asserts that the record shows that it was Brant, not the defendant, who asked Grendon to kill the victim. That portion of the record to which the defendant refers us discloses the following testimony by Grendon:

Q. You were arrested on the 13th day of September, 1976?
A. I believe it was the 14th of September.
Q. Okay. Your testimony is here today that Greg Brooks asked you to kill D. J. Lykin?
A. Yes.
Q. Did anybody else ask you to kill D. J. Lykin?
A. Yes.
Q. Who else asked you to kill D. J. Lykin?
A. Bruce Brant.

Thus it appears that both Brooks and Brant requested Grendon to do the deed. The prosecutor's statement was supported by the record.

The defendant complains that the prosecutor misstated the evidence concerning Mrs. Smith when he made the following statement to the jury: "Mrs. Smith apparently didn't commit any crimes in Cowlitz County, none that we know about, none that anyone knows about now."

The record reveals that Mrs. Smith testified as follows on cross-examination:

Q. Did you at any time take any gun, steal a gun from somebody in Cowlitz County?
A. Yes.
. . .
Q. Were you ever charged for that offense?
A. No.

We note that the question put to Mrs. Smith was double-barrelled, "take," "steal." The framing of the question was defense counsel's. In answer to the argument of defendant, the prosecutor properly notes that the characterization of a taking as stealing was that of the defense attorney and that no one knows what claim Mrs. Smith may have had to the gun or what her intent was. It is evident that she was not convicted of that crime, was not under investigation for any crime in Cowlitz County, and that her testimony was not induced by any bargain for offenses occurring in Cowlitz County. If the prosecuting attorney chose to urge a debatable inference from Mrs. Smith's testimony that no crime had actually been committed in Cowlitz County, he may have taken a tactical risk but we feel that this argument is properly within the latitude given to attorneys in making a final argument. *State v. Adams*, 76 Wn.2d 650, 458 P.2d 558 (1969), *rev'd mem. on other grounds*, 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971); *State v. Brown*, 35 Wn.2d 379, 213 P.2d 305 (1949). Further, we fail to see how this statement could be prejudicial and in any event, the jury was warned to rely

upon their own memory. Also, we note that no objection was made to this argument.

The defendant asserts that it was improper for the State's attorney to argue that Bruce Brant's testimony was basically consistent within itself. Upon objection the court admonished the jury that it would be the one which would have to remember the content of the oral evidence. A reading of the record does reveal testimony by Mr. Brant which appears to be inconsistent within itself. Nevertheless, it is of such a nature that the prosecutor was entitled to argue and persuade the jury if he could, that there was no *basic* inconsistency. The State's assertion was within the bounds of proper argument. *State v. Adams, supra.*

Defendant alleges police misconduct by tampering with a witness, Anthony Smith. The State agrees that it would be improper for a police officer to manipulate a witness.

The claim of misconduct is based upon the affidavit of Anthony Smith given after the trial in connection with the motion for a new trial, which motion was denied after thorough argument. Only paragraphs two and three relate to activity by the police.

Paragraph three of the affidavit states:

> That Karen West requested that I write a letter to Greg Brooks regarding the information which I had told the Police; that Sergeant Darrel Trotter of the Longview Police Department informed me that I should not get involved in that circumstance and I never wrote the letter.

We see no impropriety arising from this paragraph. There is no obligation upon the State through its prosecuting attorney or investigating officers, to furnish, or encourage the dissemination of information at the request of *third parties*. Whatever Smith had told the police was available to the defendant and his attorney through the pretrial discovery procedures.

Paragraph two of the affidavit states:

> That prior to my testimony, Mr. Bridgewater attempted to contact me and I was advised through my

sister by Sergeant Darrel Trotter of the Longview Police Department that I should not speak with Mr. Bridgewater.

It is to be noted that it is the witness' sister to whom Sergeant Trotter is alleged to have spoken. Her affidavit is not offered and affiant does not claim that as a result of the indirect communication that he refused to talk to Mr. Bridgewater. As a matter of fact, paragraph four of his affidavit stated that he did have pretrial conversation with Mr. Bridgewater and in no way does the affidavit suggest that his statements to defense counsel were affected by anything the police or prosecuting attorney said to him.

If it be the fact that Smith refused for a short time to talk with Mr. Bridgewater because of the hearsay communication from his sister, the prejudice, if it can be so denominated, was eradicated when he did talk with Mr. Bridgewater despite the alleged request by Sergeant Trotter.

There being no showing of actual suppression, or prejudice flowing from the police conduct, there is no error. *See State v. Haga,* 8 Wn. App. 481, 493–94, 507 P.2d 159 (1973). Further, Anthony Smith does not claim that he was threatened by anyone in authority and whatever he may have told Mr. Bridgewater at the pretrial interview, insofar as it may have departed from the truth, was because of his own subjective view of his position, and not because of any statement made to him by Sergeant Trotter. The case relied on by the defendant, *Lemire v. Helgemoe,* 21 Crim. L. Rep. 2006 (D.N.H., filed Mar. 2, 1977), is factually so different that we find it not in point. *See also Lemire v. Helgemoe,* 21 Crim. L. Rep. 2364 (D.N.H., filed June 9, 1977) denying relief.

Other prosecutorial misconduct is assigned because of questions concerning a letter, which letter had not been disclosed to the defense counsel prior to trial. It is urged that this violated the ruling made in connection with the omnibus hearing. At that hearing the prosecuting attorney orally agreed:

> To permit inspection and copying of any books, papers, documents, photographs or tangible objects which the prosecution
> (a) Obtained from or belonging to the defendant, or
> (b) Which will be used at the hearing or trial.

Probably through inadvertence the ruling of the court was not actually embodied in the omnibus order. However, we will consider the matter based upon the prosecuting attorney's oral agreement.

When shown the letter, defendant denied writing it. At this point, an objection was made and a recess called to examine the document during which time the prosecuting attorney explained to the court how he had just received the letter within the past 20 minutes from Kevin Grendon's father. Defense counsel was given time to examine it and this fact, coupled with the explanation by the prosecuting attorney concerning the means by which he had just received it, seems to us to be sufficient ground to permit the trial court to excuse literal compliance with the omnibus order. In any event, because the prosecuting attorney could not lay a foundation in the face of defendant's denial of authorship, the objection was sustained, the text of the letter was not disclosed, and the court instructed the jury as follows:

> All right, the objection is sustained. All reference to the letter will be stricken. You are to completely disregard it, any reference to the letter that was discussed just prior to the recess.

We presume that the jury followed the court's instructions. *State v. Scott*, 20 Wn.2d 696, 149 P.2d 152 (1944).

Prosecutorial misconduct is also alleged in that the prosecuting attorney subpoenaed Karen West in the presence of the jury and then did not call her. No authority is cited to support the proposition but defendant argues that prejudice resulted because the implication is that she would be called to impeach defendant's testimony about his reason for going to Phoenix.

The record itself does not contain any explanation of why she was not ultimately called, but the explanation set forth in the State's brief is that she was to be called to provide the foundation for the letter. However, during the recess, Mr. Bridgewater, who also represented Karen West on another charge, advised her as her attorney, to plead the Fifth Amendment if called. Defendant has not seen fit to challenge that explanation by way of a statement in a reply brief or in any other manner. We view this incident as mutual rough play in the heat of battle. Under the apparent circumstances, we do not consider it to be misconduct. The rule is that prosecutorial misconduct justifies reversal of a criminal conviction only when there is a substantial likelihood that such misconduct affected the verdict. *State v. Stamm,* 16 Wn. App. 603, 559 P.2d 1 (1976); *State v. Torres,* 16 Wn. App. 254, 554 P.2d 1069 (1976). Not only do we fail to view the prosecutor's conduct as misconduct, but even if it were so viewed, we do not see how it could have affected the verdict. In no way do the facts portrayed by this record compare with those noted in *State v. Torres, supra.*

Finally, the defendant urges that it was error to deny a new trial on the ground that substantial justice was not done. The granting or denial of a motion for a new trial on this ground, lies within the discretion of a trial court and will not be reversed except for abuse of the discretion. *State v. Wilson,* 71 Wn.2d 895, 431 P.2d 221 (1967); *State v. Downs,* 11 Wn. App. 572, 523 P.2d 1196 (1974).

In considering whether or not to grant the new trial, the court had before it not only its memory of the actual proceedings at trial, including the circumstances surrounding the voir dire of the jury and its fresh recollection of the testimony of the witnesses with the conflicts in that evidence, but also had the post–trial affidavit of Anthony Smith. After considering these matters, the court nevertheless denied the motion for a new trial. After reviewing the

record, including the court's well articulated reasons therefor, we find no basis for holding that the discretion of the trial court was abused.

The judgment of conviction is affirmed.

PEARSON, C.J., and PETRIE, J., concur.

Reconsideration denied June 6, 1978.

Review denied by Supreme Court November 17, 1978.