IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ARTIE LEN REINERT, JR AND CONSUELA LEE REINERT, | ) ) ) | No. 37081-0-III |
| Appellant, | ) ) ) | |
| v. | ) ) | |
| ALLEN C. HELLER, M.D. and STEPHANIE A. HELLER, husband and wife, and the martial community composed thereof; ROCKWOOD CLINIC, P.S.; ROCKWOOD NEUROSURGERY AND SPINE CENTER; DEACONESS HOSPITAL; and SPOKANE WASHINGTON HOSPITAL COMPANY, LLC, and DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) | |

FEARING, J. — Neurosurgeon Allen Heller performed a discectomy on Artie

Reinert's C5-6 cervical spine level when Reinert and Heller intended for Dr. Heller to

perform the procedure at the C6-7 level. After discovering the mistake, Dr. Heller

returned Reinert to the operating room two days later and performed the surgery at the

C6-7 level. Plaintiff Artie Reinert appeals from an adverse verdict in a medical malpractice lawsuit against Allen Heller. Reinert assigns error to numerous evidentiary rulings of the trial court. Because the trial court did not abuse its discretion in any of its rulings, we affirm the judgment entered in favor of defendant Dr. Heller.

FACTS

Artie and Consuela Reinert sued Allen Heller, M.D., and Dr. Heller's employer, Rockwood Clinic, for an alleged breach of a physician's standard of care during an anterior cervical discectomy fusion (ACDF) that Heller performed on Artie Reinert in October 2012. We refer to the plaintiffs collectively as Artie Reinert, and we refer to the defendants collectively as Dr. Allen Heller or Heller. A discectomy removes the damaged portion of a herniated disc in the spine. The anterior nature of Artie Reinert's surgery looms important in this dispute. The patient lies prone on his back. For an anterior cervical discectomy, the surgeon performs an incision through the throat, rather than through the back of the neck.

Artie Reinert suffered a disc herniation at level C6-7 of his cervical spine. A herniation occurs when the soft, central portion of the intervertebral disc bulges beyond the torn, hard outer ring of the disc. Reinert's herniated disc pressed on a nearby nerve. Reinert also experienced a disc bulge and bone spur at the C5-6 disc level.



Artie Reinert consulted with Dr. Allen Heller, a neurological surgeon, and, during initial conversations, the two discussed surgery at the C6-7 level and the C5-6 level of the spine. The physician and patient decided, however, to treat only level C6-7. Dr. Heller advised that surgery on the C6-7 level presented an urgent medical necessity due to the resulting compression on a spinal cord nerve. The large disc herniation at C6-7, if left untreated, would worsen and possibly result in paralysis. Dr. Heller did not then consider surgery on level C5-6 a medical necessity. Heller scheduled an ACDF, a common procedure, at the C6-7 level.

When performing a discectomy, the surgeon must locate the targeted disc. The cervical spine consists of seven vertebrae. Most of these vertebrae consist of square blocks stacked on one another. The first cervical vertebrae, the C1, bears the unique shape of a ring sitting on top of the C2 vertebrae. C2 also has a unique appearance. The C2 vertebrae is a square block but with a thumb-like appendage. When locating a lower level of the cervical spine during a discectomy, surgeons will often first locate levels C1 and C2, due to their unique structures, and then count down to the level sought. The C6-7 level is located toward the bottom of the cervical spine.

Neurosurgeons also employ a portable x-ray machine called a C-arm fluoroscopy machine (C-Arm) to locate the ruptured disc for a discectomy. Fluoroscopy shows a continuous X-ray image on a monitor, much like an X-ray movie. A radiology technician takes images of the cervical spine for review by the surgeon. The C-Arm rotates in an arc in order to x-ray the spine from various angles.



C-Arm fluoroscopy machine

On October 2, 2012, Dr. Allen Heller proceeded with an ACDF on Artie Reinert's C6-7 level. Dr. Heller positioned Reinert on his back on the operating table. He extended Reinert's neck so that his chin pointed toward the ceiling. Heller then endeavored to locate the targeted level.

During Artie Reinert's surgery, Dr. Allen Heller used the C-Arm to obtain a lateral fluoroscope view. To obtain that view, the radiology technician positions the C-Arm to shoot beams from left to right. A lateral x-ray permits a surgeon to view isolated levels of the vertebrae and disc space. According to Dr. Heller, on October 2, he also sought a

different view, called an anterior posterior (AP) view, or straight up and down view. He did not save images from this view, however. The AP view often provides unreliable and distorted images causing difficulty in distinguishing various vertebral bodies. During trial, Dr. Heller opined that a lateral fluoroscopic image with the use of a metallic marker affords the most reliable view for locating a disc level.

The position of the patient's shoulders can complicate locating level C6-7 with use of the C-Arm fluoroscopy machine. The patient may raise his shoulders or one shoulder may be higher than the other, both of which occurrences cause a darkened area on the x-ray, preventing a physician from clearly identifying the various spinal discs.

During Artie Reinert's ACDF, Reinert's shoulders rode high. Dr. Allen Heller employed different techniques in order to find, with the C-Arm, the lower levels of Reinert's spine. Dr. Heller first taped, with robust cloth tape, Reinert's shoulders to the operating table. Despite the taping, the x-ray showed the cervical spine only to the C3-4 level. Below this level, the image appeared black. Dr. Heller then shot still images at various angles and different planes with the C-Arm machine. The still images did not lead to a clearer view of the lower cervical spine. Heller next attempted to trick the C-Arm. He taped bags of saline fluid to the side of Reinert's neck in order to equal the density of the shoulders. This technique did not improve the image of Reinert's lower cervical spine.

Dr. Allen Heller tried a fourth technique by placing a metallic object on Artie Reinert's throat where he estimated he would cut his incision for level C6-7. Dr. Heller incised the spot and dissected down to the spinal column. He inserted a spinal needle into the immediate disc. He did not know the level at which he placed the needle because the C-Arm revealed only blackness. Heller then began internal counting. He took a "peanut," a blunt-tipped long metallic clamp and ran the peanut up the spinal column as far as he could. Another C-arm still shot revealed that the tip of the peanut sat at level C3-4. Heller then palpated down the front of the spine and counted the cervical vertebrae to the spot he concluded was level C6-7.

A normal healthy spine, without degenerative wear-and-tear, yields predictable contour when the neurosurgeon counts cervical spine levels. The bones feel like valleys and the intervertebral discs feel like peaks. When Dr. Allen Heller counted down Artie Reinert's spine, Heller felt one peak, then a valley, followed by another peak. He determined each peak to be a new bone or cervical level.

Dr. Allen Heller performed the ACDF at the level he counted to be C6-7. According to his trial testimony, he possessed 99 percent certainty that he had reached the correct disc level.

After Artie Reinert's surgery, Dr. Allen Heller ordered a CT scan to confirm that he performed the surgery at the correct location. The scan revealed that Dr. Heller had performed the ACDF on level C5-6. Heller had misinterpreted multiple peaks during his

6

palpation. At trial, Heller attributed the miscounting to bone spurs and other disc bulges in Reinert's cervical spine. Dr. Heller informed Reinert, while Reinert lay in recovery, of the mistake. Reinert responded that they had discussed conducting the procedure on the C5-6 level anyway.

Two days later, on October 4, 2012, Dr. Allen Heller performed the ACDF procedure on level C6-7. He easily found the correct spine level because of the implant at the C5-6 level remaining from the earlier surgery.

During the second operation, Dr. Allen Heller noticed a portion of the large disc herniation at level C6-7 pressing on the spinal cord protective membrane, known as the dura mater (dura). A piece of the disc herniation adhered to the dura. In removing the displaced piece of disc, Dr. Heller tore a hole in the dura, which caused spinal fluid to leak. A dural tear during surgery is rare. When the surgeon performs the discectomy in the anterior position, the surgeon cannot sew the dura shut, because no needle is small enough to permit a suture. Therefore, Dr. Heller attached patch material, either some of Artie Reinert's own muscle or an artificial substance, to patch the hole. He deposited the material and used glue to seal the tear. After patching the dural leak, Heller completed the surgery. Reinert went home the next day, which is common following an ACDF, even with a patched dural tear.

On October 9, 2012, Artie Reinert returned to the hospital emergency room. Imaging showed a bulge under the location of the C6-7 incision cite. The seal on the

dura had failed to hold. Dr. Allen Heller admitted Reinert to the hospital on October 9

and, on October 11, Heller performed a third surgery on Reinert to repair the tear. In

order to monitor the October 11 repair, Reinert stayed in the hospital until October 18,

five of which days he recuperated in the intensive care unit.

PROCEDURE

Artie Reinert filed suit against Dr. Allen Heller and his employer for negligently

performing the first ACDF on the wrong spinal level on October 2, 2012. Reinert

claimed that Dr. Allen Heller failed to follow the accepted standard of care when

attempting to locate the C6-7 disc level during the October 2, 2012 operation and Heller's

violation of the standard of care led to a second surgery two days later.

Dr. Allen Heller listed as defense medical experts: neurosurgeon Jeffrey Larson,

orthopedic surgeon Sigurd Berven, and neuroradiologist Jerome Barakos. Artie Reinert

thereafter and before trial filed a motion in limine to limit the number of experts

testifying on behalf of Dr. Heller because of the cumulative nature of the testimony. He

sought exclusion of either Dr. Jeffrey Larson or Dr. Sigurd Berven as a trial witness.

Reinert emphasized that Larson and Berven would testify identically that Heller did not

breach the duty of care and that any breach caused no harm.

In addition to moving to limit the number of expert witnesses, Artie Reinert

moved to exclude portions of neuroradiologist Jerome Barakos' preservation deposition

testimony. He objected to Dr. Barakos' comments on the use of the C-Arm fluoroscopy

machine and his testimony regarding the applicable standard of care. Reinert argued that the introduction of Barakos' testimony was cumulative of the testimony of the other experts. Reinert also contended that Barakos lacked the qualifications to render opinions on the standard of care in the use of intraoperative C-Arm fluoroscopy since Barakos acknowledged that the surgeon, not a radiologist, decides the angles of the fluoroscopy.

In response to Artie Reinert's motions in limine, Dr. Allen Heller emphasized that the testimony of the orthopedic surgeon Dr. Sigurd Berven and the neurosurgeon Dr. Jeffrey Larson would not overlap because Dr. Berven would render opinions from an academic background and Dr. Larson would testify from a local practice background. Dr. Berven would provide the jury an opinion about the standard of care, in a teaching hospital, for locating spinal levels. Dr. Jeffrey Larson would opine about the standard of care for locating spine levels when performing surgery in a local community hospital. Dr. Heller mentioned that Reinert's expert, Dr. Hamilton, like Dr. Berven, only provided an expert opinion for an academic background. In response, Artie Reinert commented that a state standard of care equivalent to a national standard of care applied such that a community hospital perspective was immaterial.

Dr. Allen Heller underscored that neuroradiologist Jerome Barakos would explain the nature of the imaging employed by Dr. Heller when performing surgery on Artie Reinert. Heller asserted that Barakos possessed extensive knowledge regarding the type of imaging used at thirty-two hospitals where surgeons perform ACDF surgery. Dr.

Barakos also possessed opinions as to causation of injury based on his review of the radiology records from Artie Reinert's care. Dr. Heller represented that Barakos would not offer standard of care testimony relevant to the performance of an ACDF procedure. After a pretrial hearing, the trial court reserved a ruling on Artie Reinert's motions in limine.

During trial, Artie Reinert called defendant Allen Heller as an adverse witness and as his first witness. Reinert's counsel asked Dr. Heller about the steps he undertook to locate the C6-7 level during the October 2, 2012 ACDF. Counsel questioned Heller regarding the availability of different technology and the use of various techniques when locating a cervical spine level during surgery. According to counsel's leading questions, the technology and methods included C-Arm views, intraoperative MRI and CT scanning, brain mapping, and 3-D imaging such as stereotactic imaging, which involves the assigning of x, y and z coordinates to an area of the body to assist in localization efforts. Reinert's counsel inquired as whether Dr. Heller considered use of any of these other technologies and techniques. Counsel asked Heller if he contemplated stopping Reinert's surgery in order to refer Reinert to another facility.

Dr. Allen Heller answered that he was not aware of stereotactic imaging in October 2012. Heller responded that he never considered terminating the discectomy because of the possibility that he located the wrong cervical level. Artie Reinert, through counsel, asserted in a leading question that Dr. Heller was:

really not aware of what, if any, status there was as to their use and application of—stereotactic or 3D technology in cervical surgeries, whether it be ACDF or other types of cervical surgeries . . . . you weren't aware— weren't aware of what was going on with it, were you?

Report of Proceedings (RP) at 206. Dr. Heller responded that he used the C-Arm machine and employed various angles and techniques to view the various vertebrae levels. Heller further testified that he obtained all views needed to perform the operation of Artie Reinert through use of the C-Arm. He averred that Deaconess Medical Center lacked an intraoperative CT scan in 2012 or at the time of trial.

Days later, Dr. Allen Heller testified in his own case. Heller's counsel asked Dr. Heller if he documented each angle shot by the C-Arm during a surgery. Heller responded that he did not. Nevertheless, according to Heller, he probably looked at an anterior-posterior view during Reinert's surgery, despite lacking any of the imaging thereafter.

Artie Reinert's counsel then cross-examined Dr. Allen Heller regarding AP views with the C-Arm. Counsel asked if Dr. Heller had any independent recollection of using views other than lateral fluoroscopic views. Heller responded that he lacked an independent recollection of every view taken of Reinert's cervical spine on October 2. Counsel for Reinert then asked,

Do you recall using an AP view in any ACDF surgery previously?

RP at 358. Dr. Heller's attorney objected and Reinert's attorney rephrased the question:

11

As you sit here today, can you recall ever using—do you have independent recollection of ever using or attempting to use an AP view, either in the direct AP mode, AP caudal, or AP coronal, in attempting to locate cervical discs during an ACDF procedure?

RP at 358-59. Dr. Heller responded:

A. Not in attempting to locate a disc. But it's not uncommon to use AP fluoroscopy to identify the midline. So I have taken AP images before during ACDF surgery, but it's more valuable in locating midline.
Q. And so your answer's you don't recall independently of ever using an AP view, either AP direct, caudal, or coronal, to identify a surgical site in the cervical spine?
A. That's correct. I generally find it very unreliable and don't specifically recall an instance of using it.

RP at 359. Dr. Heller later averred that he believed he tried every possible angle or view during Reinert's surgery, though he did not have a specific recollection of every image.

During other testimony, Dr. Allen Heller declared that, as the surgeon, he bears the responsibility for garnering the images needed during surgery. Heller acknowledged that the radiologist would not make decisions or recommendations on surgery. The radiologist limits his or her role to interpreting images.

Neurosurgeon Allan Hamilton testified as Artie Reinert's expert witness. Dr. Hamilton joined the faculty at the University of Arizona in 1990 and has devoted his career to academic medicine. He last performed surgery in 2004, although he teaches students how to perform an ACDF.

Dr. Allan Hamilton testified to the applicable standard of care. In Dr. Hamilton's opinion, Dr. Allen Heller violated the standard of care twice. First, Heller should have

anticipated problems in locating the targeted spine level. Second, once in the operating room, Dr. Heller needed to be certain he located the correct level before proceeding with the discectomy. According to Hamilton, Dr. Heller violated the standard of care when he was not certain he had located the C6-7 level, but operated anyway.

Dr. Allan Hamilton listed methods that Dr. Allen Heller could have employed to isolate the C6-7 level. Before surgery, Dr. Heller could have taken a "frameless stereotactic MRI" or CT-scan. RP (June 19, 2019) at 34-35. During surgery, Heller could have shot different views with the C-Arm, including an AP view.

Regarding a stereotactic MRI, Artie Reinert's counsel questioned:

> Q. And how—could that have been—do you know whether or not
> that could have been achieved at the Deaconess center in 2012?
> A. Yes.
> Q. You think so?
> A. The technology exists. Yeah.

RP (June 19, 2019) at 35.

Dr. Allan Hamilton also opined that Dr. Heller had the option to abandon the procedure when he could not be certain he had identified the C6-7 level.

> So we abort procedures. It's unusual but we abort procedures, particularly if we have either technical difficulties we had not anticipated or something else is going on with the patient's physiology that's making the surgery more dangerous than we thought. But we always have the option of backing out and telling the patient I wasn't happy with the conditions and I'm going to regroup.
> I may use a different technology. I may go to a different hospital. Some hospitals have intraoperative CTs. You can actually do a CT scan in

13

the operating room to be sure where you're at. So you could book it in a
room where you have operative CT.

RP (June 19, 2019) at 36. Dr. Hamilton declared that Swedish Medical Center and the
University of Washington Medical Center performed CT scans in the operating room.
Dr. Hamilton explained that a physician should not use post-operative imaging to confirm
that he or she correctly completed surgery at the correct location.

During his trial testimony, Dr. Allan Hamilton acknowledged that, had a single
level fusion been conducted on level C6-7 at the time of surgery, additional forces would
have been placed on level C5-6. As a result, a higher likelihood of degenerative
progression would have existed at level C5-6. Hamilton, however, would not opine on a
more probable than not basis whether Artie Reinert would have needed future surgery on
level C5-6. On cross-examination, Dr. Heller's counsel asked Dr. Allan Hamilton
whether he intended to testify that Artie Reinert had a diagnosable neurological injury as
a result of the surgeries performed by Dr. Heller, to which Hamilton responded, no.

Before Dr. Jerome Barakos testified in Dr. Allen Heller's case, the trial court
entertained further oral argument on Artie Reinert's pretrial motion to exclude portions of
Dr. Barakos' preservation deposition. Reinert argued that Dr. Barakos' lack of
qualifications as a neurosurgeon and his cumulative testimony demanded redactions.
Reinert emphasized that Dr. Barakos did not enter operating rooms, but instead received
images taken by a surgeon during surgery. Reinert mentioned that Dr. Barakos testified

that surgeons do not use the AP view during ACDF surgeries, which testimony conflicted with Dr. Allen Heller's testimony that he may have used an AP view. Reinert contended that experts Dr. Allan Hamilton and Dr. Allen Heller already agreed that level C5-6 had degenerative disease and, therefore, Dr. Barakos' similar testimony was unnecessary. Finally, according to Reinert, Dr. Barakos' testimony regarding the absence of neurological damage resulting from the surgeries on Artie Reinert as shown by imaging repeated the opinions of Dr. Hamilton and Heller.

In its ruling, the trial court ordered the redaction of Dr. Jerome Barakos' testimony that literature reflected that fifty percent of all surgeons had performed surgery on an incorrect vertebrae level. The parties also agreed that Dr. Barakos' testimony regarding the appropriate standard of care should not be admitted. Therefore, Dr. Allen Heller agreed to redact the following testimony:

> A: Let's see. So a wrong-level surgery is not seen as a breach of the standard of care. Why? Because the methods employed to identify the appropriate level of surgery are well defined and well accepted. And just as in this case, the standard is one of counting, numerically counting.

Clerk's Papers (CP) at 273

The jury thereafter saw and heard Dr. Jerome Barakos' videotaped testimony. Through the preserved deposition, Dr. Barakos testified that he is a board-certified neuroradiologist and currently the director of neuroimaging for the Sutter Hospital system in California, a position which he has held since 1992. Barakos explained the role

15

of a radiologist as a physician who interprets imaging studies to assist the primary

physician engaged in a task. He is not a radiologist technician, nor a surgeon, and he

does not generate images. He is not present in the operating room. A neuroradiologist

interprets images including x-rays, MRIs, and fluoroscopy. He does not use the images

to evaluate a procedure. Dr. Barakos acknowledged that he reviews only images that the

surgeon decides to archive, and the surgeon does not archive every image taken during a

procedure. Barakos testified that only a radiologist, because of training and certification,

holds the privilege to issue a final report on imaging studies.

Dr. Jerome Barakos testified to the characteristics and uses of fluoroscopy.

"[I]ntraoperative lateral fluoroscopy" is performed in conjunction with ACDF surgeries.

CP at 235. According to Barakos, the surgeon only employs the lateral view with an

anterior cervical discectomy fusion on the cervical spine, which limits imaging of the

upper levels of the cervical vertebrae. Barakos averred that he recalled no time when the

surgeon shot an anterior-posterior view during an ACDF. He elaborated:

> And basically, it has to do with the fact that if you obtain a
> radiograph in that direction, the head and the skull and the facial structures,
> a lot of bone overlies the proximal cervical spine. So the proximal cervical
> spine, the C1-C2, is best visualized from a lateral perspective because
> there's less tissue, and certainly less bone . . . from a frontal AP view, it's
> very hard, if not impossible, to see the C1-2 levels. You can certainly see
> lower down well, but upper areas are obscured by the skull. So as a result,
> you're not accomplishing your objective of visualizing the cervical spine.

16

CP at 236-37. Dr. Barakos further explained that an AP view would result in a "parallax effect" that distorted the area that needs to be counted during a cervical discectomy.

On cross-examination, Dr. Jerome Barakos opined:

> an AP caudal view would not show us with any clarity the proximal portion of the spine. . . .
> So in summary, an AP view would not provide additional localization information which is why, as I've outlined, I can't recall one being used in any of our facilities for as long as I've been there.

CP at 287-88. Dr. Barakos avowed that neurosurgeons never employ other technologies, such as Stealth Station, Brainlab, stereotactic, or 3-D navigation, during an ACDF.

Dr. Jerome Barakos testified that he examined the preoperative, intraoperative, and postoperative imaging taken of Artie Reinert. He averred that the images showed no injury caused by the surgeries conducted by Dr. Allen Heller. Barakos added that an MRI done on August 14, 2012 before Reinert's first surgery showed a "moderate spinal canal stenosis" at level C5-6 and a "severe spinal canal stenosis" at level C6-7. CP at 249. "Stenosis" is the narrowing of a blood vessel or valve that restricts blood flow. Dr. Jerome Barakos admitted that rarely does the surgeon order a CT scan immediately after surgery to ensure surgery on the correct location. He knows of only two instances, during his twenty-five year career, when a neurosurgeon ordered a postsurgery scan.

Dr. Jerome Barakos acknowledged Dr. Allen Heller's opinion that, on October 2, Artie Reinert needed surgery only at the C6-7 level. In response to a question from Artie Reinert's counsel regarding whether Dr. Barakos could predict, on a more probable than

17

not basis, whether further degeneration on the C5-6 disc would have caused later symptoms, Barakos responded:

> A. Yes, sir. I would state with reasonable medical probability, doing this for over 25 years in a high-volume spinal center, that if someone only did the more pronounced 6-7 level, we know by definition and the literature supports the concept of adjacent segment degenerative disease, which means that if this 6-7 level is a solid fused block which is the intended goal of surgery, there will be additional dynamic forces and pressure being applied to the contiguous levels.
>
> *Since at this point in time the C5-6 level already shows significant degeneration with impingement on the spinal cord, I would state with reasonable medical probability sometime down the road Mr. Reinert is going to need additional level surgery.*
>
> Now, I can't say whether it's going to be months later or years later. I would defer to a surgical expert. But I'm certainly in a position with my experience and training to know that that is a real and expected condition, namely, after a single-level surgery given the degree of disease Mr. Reinert already displays at the C5-6 level, that it's going to be pretty much an inevitable outcome that this spinal canal stenosis and continued again— and remember, the gentleman's relatively young at this point, He's only 49—that in the years to come, we would expect advanced degenerative changes at the C5-6 level.

CP at 280-81 (emphasis added).

During the playing of Dr. Jerome Barakos's video testimony, the disk played portions of testimony that the trial court ordered redacted. The video first played portions of testimony referencing the number of surgeons who had performed wrong level surgeries. Artie Reinert did not then object. The video then played Dr. Barakos' answer regarding the standard of care, though it did not include the question asked. Artie Reinert objected to the testimony and the following colloquy ensued:

18

MR. RICELLI [counsel for Artie Reinert]: Your Honor?

THE COURT: Is there an issue?

(Video Deposition Paused.)

MR. SESTERO [counsel for Dr. Allen Heller]: That should have been omitted from line 22 before . . .

THE COURT: I'm sorry?

MR. SESTERO: That should have been omitted from line 22 of page 53.

MR. RICCELLI: Subject to the motion in limine.

MR. SESTERO: I have no problem with an instruction to the jury that the most recent answer should be stricken.

THE COURT: Page 53, line 22?

MR. SESTERO: That's what I have written down.

THE COURT: Okay.

MR. SESTERO: That it's gone into page 54.

THE COURT: All right, so that should have been redacted? It should not have been played?

MR. SESTERO: That most recent answer should have been redacted.

MR. RICCELLI: Yes.

THE COURT: You agree. So I'll—

MR. RICELLI: Yes.

THE COURT: —instruct the jury to disregard the last—I guess the question?

MR. SESTERO: It's all—it's the answer.

MR. RICELLI: The answer about the national standard of care—

THE COURT: Okay.

MR. RICCELLI: —and which he's not a surgeon.

(VIDEO DEPOSITION WAS RESTARTED FOR A SECOND AND IMMEDIATELY STOPPED.)

THE COURT: Okay, I don't know that he got—actually got into the answer. *In any regard, disregard the last question-and-answer series please.*

MR. SESTERO: May we, for technical reasons—

THE COURT: Yeah.

MR. SESTERO:—take an afternoon break, and then we'll—

THE COURT: Let's do that.

MR SESTERO:—wrap up?

THE COURT: Let's do it. Let's take a short recess.

19

(JURY LEFT COURTROOM.)
THE COURT: Okay. Are you going to go through the rest of this to make sure that it's accurate?
MR. SESTERO: Yes.
THE COURT: I'll step down, then.

RP at 22-24 (emphasis added).

The defense called Dr. Sigurd Berven, a spine surgeon and the chief of spine services at the University of California in San Francisco, to testify.  Dr. Berven opined that Artie Reinert suffered degenerative spinal disease on multiple levels of his cervical spine, including levels C4-5, C5-6, and C6-7 and mild signs of the disease below C6-7. He averred that Dr. Allen Heller met the standard of care.  He explained that the surgical outcome does not define whether a surgeon provided reasonable care, stating in part:

> I think really the process is what the surgeon is accountable for, as is the appropriate process; and a process is consistent with the standard of care.

RP at 37.

According to Dr. Sigurd Berven, Dr. Allen Heller complied with the standard of care when he employed lateral intraoperative fluoroscopy with the C-Arm and the counting method to localize the C6-7 level.  The method to be employed is a judgment call for the neurosurgeon.  Dr. Berven further opined that Allen Heller need not have used stereotactic navigation or an AP view to meet the standard of care.

During his testimony, Dr. Sigurd Berven stated that he understood from Dr. Heller's testimony that Heller used AP views to assist in finding a level or midline during

20

an ACDF surgery. Dr. Berven testified that he had shot AP views to assist during an

ACDF surgery, but he and other surgeons mostly rely on lateral views. An AP image can

be inaccurate. Counsel for Artie Reinert asked:

> Q. *Dr. Barakos testified yesterday by video deposition that he's never seen an ACDF surgeon ever use an A—an AP view on any of his cases.*
> A. *Well, Dr. Barakos isn't a surgeon.* But it's my clear testimony that the most reliable images are going to be the lateral projections, and I rely on those most. There can be a lot of reasons that the AP image is off; specifically, you can't actually see the most identifiable landmark (indicating), which is the odontoid process, because the mandible's in the way. So you can't see the top of the spine to count from the top, and trying to count from the bottom can be really difficult. There's all sorts of bones between the first rib and the clavicle that can really make it difficult to count from the bottom. So therefore the lateral is the x-ray that I rely upon most.
> Q. Okay. *But my question was about Dr. Barakos, who stated yesterday he doesn't think AP surgeons ever use the AP view. Is he incorrect in that statement as far as your practice is concerned?*
> A. *Again, Dr. Barakos is a radiologist. He's not a surgeon.* So what actually happens in the operating room, I think I'd be—I'd be in a position to testify to.

RP at 60-61 (emphasis added).

On cross-examination, Dr. Sigurd Berven testified that he would terminate a

surgery if he could later return to the surgery under more optimal circumstances.

Nevertheless, if a good x-ray showed the peanut on the C3-4 level, as in the surgery of

Artie Reinert, he would have counted down from the well-defined level. Dr. Berven

disagreed with Dr. Allan Hamilton's testimony that, even assuming the availability of an

intraoperative CT scan, the scan might not provide reliable results in the operating room.

Berven explained that, with a small incision used in an ACDF procedure, the surgeon lacks sufficient room to directly place a marker on the bone. He characterized the use of an intraoperative CT to locate the C6-7 level as misguided. Berven declared that his operating theaters in 2012 did not employ fiducial or stereotactic navigation.

Dr. Sigurd Berven opined that Dr. Allen Heller acted reasonably when he proceeded with surgery when he believed he had a 99 percent certainty of the location of the C6-7 level and then ordered a postoperative image due to the one percent doubt. Dr. Berven also rebutted the possibility of referring Reinert to another facility:

> Then the notion of possibly sending the patient to a tertiary care center, to Seattle for example, that—that's something that I think would involve significant risk in terms of transportation of somebody who has such severe stenosis. But also reoperating could introduce other risks, infection and other complications.

RP at 45-46. According to Dr. Berven, Dr. Heller met the standard of care when he proceeded with surgery based on the evidence and his judgment.

Dr. Sigurd Berven also testified about the dural tear that occurred on October 4, 2012 during the second surgery conducted by Dr. Heller on Artie Reinert. Dr. Berven opined that the tear healed by the time of Reinert's discharge on October 18, 2012. Berven testified that a dural tear can occur despite a surgeon using reasonable care. He also averred that, had Heller performed, on October 2, the ACDF on level C6-7 as intended, a tear was equally likely to occur as on October 4.

22

Dr. Sigurd Berven concluded that no injury resulted to Artie Reinert from Dr. Allen Heller's care. Dr. Berven opined that any continuing neck pain suffered by Reinert likely resulted from the preexisting levels of degeneration at multiple levels of the cervical spine. According to Berven, Heller's operation on the C5-6 level on October 2 caused no harm because Reinert likely would have needed the surgery at a later time.

Allen Heller's defense also called Dr. Jeffrey Larson to testify during trial. Before the testimony, Artie Reinert again objected to Larson's testimony as cumulative since his testimony focused on the standard of care, the counting down method of locating a cervical spine level, and use of AP fluoroscopy. Other witnesses had already addressed these subjects. Dr. Allen Heller responded that Dr. Larson knew the resources at Deaconess Medical Center and those resources available at a community hospital, whereas the defense's other expert, Dr. Sigurd Berven, practiced in academia and at a major medical center in a large metropolitan area. Heller stated that his counsel would pose Larson questions regarding the standard of care based on the neurosurgeon's role at a community hospital and based on his knowledge of resources available at a community hospital. Counsel disclosed the intent to ask Larson, from a surgical practitioner's standpoint, whether terminating the surgery and referring Reinert would have been required or appropriate. Artie Reinert replied that he did not contend that Deaconess lacked any needed resource. Instead, he argued that Dr. Heller should have sent Reinert

to another facility.  Finally, Reinert objected to the use of a community hospital standard as contrary to law.

The trial court allowed the testimony of Dr. Jeffrey Larson because of his encountering different experiences from Dr. Allan Hamilton and Dr. Sigurd Berven.  The court, nonetheless, directed Artie Reinert's counsel to object if, at some point, the testimony became exceptionally cumulative.

Dr. Jeffrey Larson testified that, from 1997 to 2003, he practiced in Spokane at Sacred Heart Medical Center and Deaconess Medical Center.  In 2003, he moved to Coeur d'Alene and established a private clinic, and he conducts surgeries at Kootenai Medical Center.  Larson distinguished between a community hospital, where one treats the community, and an academic center, where one teaches and trains young physicians.

During direct examination, Dr. Allen Heller's attorney inquired as to whether Dr. Jeffrey Larson believed that Dr. Heller violated the standard of care "*given your community practice of neurosurgery*."  RP at 77 (emphasis added).  Artie Reinert's lawyer objected to the question as cumulative.  The court overruled the objection, and Larson opined that Heller did not violate the standard of care.

Defense counsel next asked Dr. Jeffrey Larson:

> Q.  *In the community hospitals that you worked at and were aware of in Spokane and Coeur d'Alene in 2012*, what did the standard of care require for localization of the surgical level in a C6-7 ACDF operation on a patient like Mr. Reinert?

24

RP at 77 (emphasis added).  Reinert again objected on the basis of cumulative testimony, and the court overruled the objection.  Dr. Larson responded:

> A. The standard of care in the community hospital in this area in Spokane then in 2012 is the same as it is now in 2019.  And it is lateral localization of the C spine level, whether it be seeing it directly or by seeing the lowest level that you can see and then counting from that level.

RP at 78.  Dr. Larson added that a neurosurgeon does not necessarily breach the standard of care when performing an operation at the wrong cervical level.  The surgeon did not need 100 percent certainty of the correct location to comply with the standard of care.

Later, in questioning Dr. Jeffrey Larson, Dr. Allen Heller, through counsel, made another community reference:

> Q. Sir, *as a community spinal surgeon*, did the standard of care under the circumstances that existed on October 2, 2012 require Dr. Heller to refer Mr. Reinert out of the community hospital to a different level of care?
> A. Can you ask the front part of that question again? It's—
> Q. It was poorly worded. I'll try it again.
> A. Okay.
> Q. *Given that Deaconess was a community hospital* and given the challenges presented by the imaging on October 2, 2012, did the standard of care as it applied to Dr. Heller that day require him to refer Mr. Reinert out to an academic center?
>> MR. RICCELLI: Object to the form of the question.  The foundation as to community hospital is not relevant to standard of care.
>> THE COURT: Okay, overruled.
> A. I have to ask you to ask that one more time, sorry.  I'm—it got lost in the. . . .
> Q. I'm going to tighten it up as best I can.
> A. Okay.

>    Q. Did Dr. Heller need to refer Mr. Reinert out to an academic center like Harborview or University of Washington under the circumstances that existed on October 2, 2012?
>    A. No, he did not.

RP at 80 (emphasis added).  Despite being an expert on community, not teaching, hospitals, Larson explained that the Seattle teaching hospitals had no equipment that Deaconess lacked.

On cross-examination, Dr. Jeffrey Larson repeated that he testified to the standard of care "in this community."  RP at 83.  He elaborated that he believed the standard of care in Washington State equaled that of the national standard.  He added that the standard of care at Deaconess Medical Center and Harborview Medical Center echoed the other.

The jury entered a verdict in favor of Dr. Allen Heller and his employer.

## LAW AND ANALYSIS

On appeal, Artie Reinert asserts the same evidentiary objections he forwarded during trial.  He also contends that defense trial counsel engaged in misconduct when playing portions of Dr. Jerome Barakos' videotape deposition that the trial court earlier excluded.

### Community Standard of Care

On appeal, Artie Reinert contends that Dr. Jeffrey Larson referenced a community hospital standard of care, which misstated applicable Washington law.  Dr. Allen Heller

responds that Reinert failed to preserve this argument on appeal. Allen Heller argues, on the merits, that any reference to the community or a community hospital was appropriate for three reasons. First, neither Dr. Heller nor Dr. Jeffrey Larson ever defined the standard of care as limited to a community hospital or another healthcare provider in Dr. Heller's community. Second, the standard of care in Washington State as outlined in RCW 7.70.040 permits consideration of the circumstances in which a healthcare provider acted. Third, the other experts in the case, Dr. Allan Hamilton and Dr. Sigurd Berven, practiced in large academic centers, whereas Dr. Larson provided testimony from his personal experience in the community hospitals of Deaconess Medical Center and Kootenai Health. Finally, Allen Heller argues that any alleged error is harmless. Reinert replies that Dr. Heller did not need to submit testimony from Dr. Larson regarding the resources, specifically advanced imaging techniques, available at Deaconess Medical Center because Reinert's expert, Dr. Allan Hamilton, never attributed the failure to use such resources as a basis for Dr. Heller's breach of the standard of care.

*Issue 1: Whether Artie Reinert preserved a challenge to Dr. Jeffrey Larson's testimony that referenced a community hospital, community practice, or community standard of care?*

*Answer 1: No.*

To determine whether Artie Reinert preserved error, we must outline instances during which Dr. Allen Heller's counsel mentioned a community hospital standard of care when posing questions to Dr. Jeffrey Larson. Heller's counsel asked Larson:

> Based on your review of all the materials and your education, skills, and experience, and *given your community practice of neurosurgery*, do you have an opinion whether Dr. Heller met or violated the standard of care when he performed the operation on Mr. Reinert on October 2, 2012?
> MR. RICCELLI: Objection to the form of the question. It's cumulative.
> THE COURT: Okay, overruled.
> A. Yes, I do.
> Q. What is your opinion, sir?
> A. He did not violate the standard of care.

RP at 77 (emphasis added). We henceforth refer to this question as the first question.

> *In the community hospitals that you worked at* and were aware of in Spokane and Coeur d'Alene in 2012, what did the standard of care require for localization of the surgical level in a C6-7 ACDF operation on a patient like Mr. Reinert?
> MR. RICCELLI: Objection. Again, it's cumulative.
> THE COURT: Okay, overruled.
> A. The standard of care in the community hospital in this area in Spokane then in 2012 is the same as it is now in 2019. And it is lateral localization of the C spine level, whether it be seeing it directly or by seeing the lowest level that you can see and then counting from that level.

RP at 77-78 (emphasis added). We hereafter refer to this question as the second question.

Artie Reinert's attorney objected to the first and second questions on the basis that the questions were cumulative. Reinert did not object on the ground that the questions wrongly assumed a community practice or hospital standard of care applied. The court

28

overruled objections to both questions solely on the grounds that Reinert raised the

objection of cumulative evidence.

Artie Reinert's counsel next objected after Dr. Allen Heller's counsel asked Dr.

Jeffrey Larson:

> Q. Sir, as a *community spinal surgeon*, did the standard of care under
> the circumstances that existed on October 2, 2012 require Dr. Heller to
> refer Mr. Reinert out of the *community hospital* to a different level of care?
> A. Can you ask the front part of that question again? It's—
> Q. It was poorly worded.  I'll try it again.
> A. Okay.

RP at 80 (emphasis added).  We refer to this question as the third question.  Defense

counsel rephrased the question:

> Q. Given that Deaconess was a *community hospital* and given the
> challenges presented by the imaging on October 2, 2012, did the standard
> of care as it applied to Dr. Heller that day require him to refer Mr. Reinert
> out to an academic center?
> MR. RICCELLI: Object to the form of the question. The foundation
> as to community hospital is not relevant to standard of care.
> THE COURT: Okay, overruled.

RP at 80 (emphasis added).  We refer to this reshaped question as the fourth question.

Dr. Larson asked counsel to rephrase the question once more.  In a third attempt to please

Dr. Larson, Heller's counsel removed the word "community" and asked:

> Did Dr. Heller need to refer Mr. Reinert out to an academic center
> like Harborview or University of Washington under the circumstances that
> existed on October 2, 2012?

RP at 80. We refer to this question as the fifth question. Dr. Larson answered, "No, he did not." RP at 80.

An appellant may challenge evidentiary error only on a specific ground forwarded before the trial court. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). This rule permits the trial court to have the first opportunity to prevent or cure an alleged error. *State v. Kirkman*, 159 Wn.2d 918, 926 (2007). A trial court may then exclude or strike the challenged testimony. *State v. Kirkman*, 159 Wn.2d at 926.

To repeat, Artie Reinert objected to the first two questions on the sole basis of cumulative testimony. He now raises an alternative basis for reversal, arguing that questions one and two assumed an improper standard of care. Based on *State v. Kirkman*, we agree with Allen Heller that Reinert may not now challenge the testimony on new grounds.

Artie Reinert may be asking this court to ignore his lack of an objection to the first two questions based on the wrong legal standard by arguing that the trial court indicated that the court would overrule any objection based on a community hospital standard of care and that Reinert earlier made a "clear record" of his objection. Amended Br. of Appellants at 30. We disagree. The trial court earlier overruled an objection to Dr. Jeffrey Larson's testimony on the sole basis of cumulativeness. Artie Reinert had not objected before to the testimony of Dr. Larson being based on an irrelevant or erroneous legal standard. Although the two objections may possess some relationship in this unique

setting, the two objections are distinct. In response to Dr. Heller's counsel's first two references to a community hospital when questioning Dr. Larson, Reinert did not afford the trial court any opportunity to determine whether mention of a community hospital or practice was irrelevant on the ground that no community hospital standard of care exists in Washington State.

Artie Reinert may also be arguing that, during the pretrial arguments on his motions in limine, he commented that Dr. Allen Heller's reference to a community hospital perspective was irrelevant to the state standard of care that controlled the malpractice claim. If Reinert in fact forwards this argument, we disagree. Reinert never brought a motion to exclude references to a community hospital or local standard of care.

When Allen Heller's counsel asked the fourth question, Artie Reinert finally objected on the basis that the suggestion of a community hospital standard lacked relevance because it assumed a mistaken standard of care. Dr. Jeffrey Larson, however, did not respond to the fourth question. So Larson presented no testimony based on a community or local standard of care. When Heller's counsel rephrased the question one more time, counsel omitted any mention of a community hospital, a community practice, or a community standard. Reinert's attorney did not object to this fifth question.

*Issue 2: Whether testimony of a community or local standard of care conflicted with Washington State's state standard of care?*

*Answer 2: We do not address this question because Dr. Jeffrey Larson did not testify to a community standard of care.*

Artie Reinert complains that Dr. Jeffrey Larson mentioned a community standard of care. In turn, Reinert objects that mention of this standard of care lowers the standard to which Dr. Allen Heller needed to comply. Reinert emphasizes that RCW 7.70.040(2) requires the health care provider to exercise the degree of care expected in the state of Washington. In response, Dr. Heller contends that any mention by Dr. Larson of practicing in the community coincides with the statute's notion that the health care provider must exercise that degree of care expected of a practitioner in the state of Washington "acting in the same or similar circumstances."

We do not address this assignment of error. Dr. Jeffrey Larson declined to answer any question that assumed a local or community practice standard of care. Dr. Larson and other defense experts mentioned the presence of different technology at Deaconess Hospital from teaching hospitals in Seattle, and those witnesses mentioned using the available technology. Nevertheless, no witness testified to a different standard of care in Spokane from Seattle or forwarded an opinion based on a lower standard of care for community practitioners.

*Issue 3: Whether testimony about a community standard of care constituted harmless error?*

*Answer 3: We do not address this question because we find no error.*

32

Cumulative Testimony of Berven and Larson

*Issue 4: Did the trial court abuse its discretion by permitting cumulative testimony from Dr. Jeffrey Larson and Dr. Sigurd Berven?*

*Answer 4: No.*

Artie Reinert next argues that the trial court erred by permitting Dr. Jeffrey Larson to provide testimony cumulative to that of Dr. Sigurd Berven. He argues that Dr. Larson's testimony, when read in its entirety, provide no unique perspective or experience when compared with the other experts. Dr. Heller responds that, although Dr. Berven and Dr. Larson presented overlapping testimony, the trial court properly admitted both witnesses' testimony because both held qualifications to testify, the two possessed distinct experiences, and both provided helpful testimony to the jury.

The admissibility of cumulative evidence lies within the trial court's discretion. *Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626 (1994). The trial court generally does not abuse its discretion when excluding cumulative testimony or when allowing cumulative testimony. *Larson v. City of Bellevue*, 188 Wn. App. 857, 883, 355 P.3d 331 (2015), *aff'd sub nom. Spivey v. City of Bellevue*, 187 Wn.2d 716, 389 P.3d 504 (2017), *overruled on other grounds by Clark County v. McManus*, 185 Wn.2d 466, 372 P.3d 764 (2016); *Saldivar v. Momah*, 145 Wn. App. 365, 396, 186 P.3d 1117 (2008). *Carson v. Fine*, 67 Wn. App. 457, 462-63, 836 P.2d 223 (1992), *aff'd in part, rev'd in part*, 123 Wn.2d 206, 867 P.2d 610 (1994). The admission of evidence which is merely

33

cumulative is not prejudicial error. *State v. Todd*, 78 Wn.2d 362, 372, 474 P.2d 542 (1970); *Carson v. Fine*, 67 Wn. App. 457, 463 (1992).

Dr. Heller relies on *Christensen v. Munsen*, 123 Wn.2d 234 (1994). Plaintiff Maren Christensen argued that the defense violated the trial court's order that only one expert per side could testify as to causation or the standard of care. The trial court had ordered that each party would be limited to "one expert per specialty area, not to exceed two experts per specialty." 123 Wn.2d at 240. Of course the ruling was confusing, because the order first allowed only one expert and then allowed two experts. The court listed the five specialty areas as pars planitis, glaucoma, pharmacology, economics, and rehabilitation. Perhaps the trial court deemed "specialty areas" to mean narrow subject matters and "specialty" to be physician practice specialties.

In *Christensen v. Munsen*, our high court reviewed the context of the trial court's order and determined that the trial court intended to permit one expert to testify to each of five specialty areas in the case. The high court held that multiple experts testifying regarding causation and the standard of care did not violate the court's order, provided they came from the different areas of each specialty. Still the opinion suggests that more than one ophthalmologist testified on behalf of the defense. The Supreme Court noted that sometimes overlapping testimony of experts was inevitable. If *Christensen v. Munsen* helps any party, that party is defendant Allen Heller.

Dr. Jeffrey Larson and Dr. Sigurd Berven testified for Allen Heller on the standard of care of a neurosurgeon. The trial court allowed both to testify because the two physicians brought different experiences to court. The testimony of both overlapped extensively. Nevertheless, the trial court may admit cumulative testimony in its discretion. Any admission did not prejudice Artie Reinert.

Artie Reinert concludes by arguing that Dr. Jerome Barakos also commented on the standard of care adding to the cumulative testimony by Dr. Allen Heller's experts. Before Dr. Barakos' testimony, the trial court ordered his standard of care testimony redacted from his deposition testimony. The testimony inadvertently played at trial. Because Reinert develops his argument related to Dr. Barakos' testimony in subsequent assignments of error, we address whether admission of the standard of care testimony from Barakos prejudiced Reinert within subsequent analysis.

Admissibility of Jerome Barakos Testimony

Artie Reinert challenges the entire testimony of Dr. Jerome Barakos on numerous grounds: that he testified on a subject matter for which he lacked the requisite knowledge, skill, experience, training, education, and foundation; that the testimony was irrelevant; that the testimony was cumulative; that the testimony was more prejudicial than probative; that the testimony could not be reasonably expected to assist the trier of fact to understand the evidence or to determine a fact in issue; that the testimony likely caused

the jury to speculate about an issue not before the jury. We catalogue the challenges into

four categories: lack of expertise, relevance, cumulativeness, and ER 403.

*Issue 5: Whether Dr. Jerome Barakos held the necessary expertise to provide the*

*opinions he supplied the jury?*

*Answer 5: Yes.*

Artie Reinert argues that the trial court abused its discretion by refusing to exclude

all testimony from Dr. Jerome Barakos. Reinert argues that Dr. Barakos, as a

neuroradiologist, lacked a surgeon's knowledge or experience of using a C-Arm during

an ACDF surgery. Reinert underscores alleged inconsistencies between Dr. Barakos'

testimony and that of other experts on appeal. Reinert also contends that Dr. Barakos did

not conduct clinical assessments of patients' symptoms and, therefore, he improperly

opined on the need for future surgery on the C5-6 level should surgery have been

performed on the C6-7 level on October 2. Dr. Allen Heller responds that Dr. Barakos

specialized in spinal imaging such that he possessed the qualifications to testify to

liability and causation of which spinal imaging played a central role.

A physician with a medical degree will ordinarily be considered qualified to

express an opinion with respect to any medical question, including questions in areas in

which the physician is not a specialist, so long as the physician has sufficient expertise to

demonstrate familiarity with the medical procedure or problem at issue in the action.

*Davies v. Holy Family Hospital*, 144 Wn. App. 483, 494, 183 P.3d 283 (2008), *abrogated*

*on other grounds by Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 393 P.3d 776 (2017). The scope of the witness' knowledge rather than his or her professional title governs the threshold question of admissibility of expert medical testimony in a malpractice case. *Hill v. Sacred Heart Medical Center*, 143 Wn. App. 438, 447, 177 P.3d 1152 (2008).

We conclude that Artie Reinert's observations of Dr. Jerome Barakos' practice limitations did not disqualify Dr. Barakos from testifying to those opinions he rendered. Dr. Barakos did not testify that a neurosurgeon violates the standard of care by failing to perform an anterior posterior view of the cervical spine with the C-Arm machine. Instead he testified that, in his experience as a radiologist reviewing the imaging, no neurosurgeon had ordered the AP view. He explained that, because of the lay of the skull over the cervical spine, the imaging from an AP view would result in the cervical region appearing black. Dr. Barakos further explained that an AP view would result in a "parallax effect" that distorted the area that needs to be counted during a cervical discectomy. CP at 237. Finally, Dr. Barakos avowed that neurosurgeons never employed other technologies, such as StealthStation, Brainlab, stereotaxis, and 3-D navigation, during an ACDF. Barakos' experience and training as a radiologist reading images would qualify him to provide testimony as to the types of imaging technologies employed by neurosurgeons.

Artie Reinert contends that Dr. Jerome Barakos' testimony conflicted with that of other experts as Barakos denied that ACDF surgeons ever use AP views in localization efforts. Regarding the use of the AP view during an ACDF surgery, Dr. Barakos testified that, in his experience, he could not "recall a single case in which a front-to back referred to anterior-posterior view was employed." RP at 236.

Dr. Allen Heller testified that he believed he used the AP view during the discectomy performed on Artie Reinert. Nevertheless, he no longer had an independent recollection of every view that he or the radiologist technician procured during surgery. Dr. Heller explained that he would not use the AP view "in attempting to locate a disc. But it's not uncommon to use AP fluoroscopy to identify the midline. So I have taken AP images before during ACDF surgery, but it's more valuable in locating midline." RP at 359. He stated, "I'm certain in that particular case we tried every method possible." RP at 359. He testified that he finds the AP "very unreliable." RP at 359.

Dr. Sigurd Berven stated that he understood from Dr. Allen Heller's testimony that he used AP views. Dr. Berven testified that he had used AP views during ACDF surgeries either to find the midline or a cervical level. Counsel for Artie Reinert inquired as to Dr. Jerome Barakos's testimony, asking:

> Q. *Dr. Barakos testified yesterday by video deposition that he's never seen an ACDF surgeon ever use an A—an AP view on any of his cases.*
> A. *Well, Dr. Barakos isn't a surgeon.* But it's my clear testimony that the most reliable images are going to be the lateral projections, and I

rely on those most.  There can be a lot of reasons that the AP image is off; specifically, you can't actually see the most identifiable landmark (indicating), which is the odontoid process, because the mandible's in the way.  So you can't see the top of the spine to count from the top, and trying to count from the bottom can be really difficult.  There's all sorts of bones between the first rib and the clavicle that can really make it difficult to count from the bottom.  So therefore the lateral is the x-ray that I rely upon most.

> Q.  Okay.  *But my question was about Dr. Barakos, who stated yesterday he doesn't think AP surgeons ever use the AP view.  Is he incorrect in that statement as far as your practice is concerned?*

> A.  *Again, Dr. Barakos is a radiologist.  He's not a surgeon.*  So what actually happens in the operating room, I think I'd be—I'd be in a position to testify to.

RP at 60-61 (emphasis added).

We disagree that any inconsistencies demonstrate that Dr. Jerome Barakos lacks

qualifications to opine on imaging taken during an ACDF procedure.  Dr. Barakos

particularly possesses the training and experience in reading imaging so he would be an

expert on what views allow the best look at the cervical spine.  Any denigration of

Barakos' expertise by Dr. Sigurd Berven goes to the weight of Barakos' testimony, not its

admissibility.  Contrary to Reinert's contention, Dr. Barakos did not assert that

neurosurgeons never order an AP view.  Dr. Barakos testified that he had never noticed

an AP view ordered.

Artie Reinert particularly challenges Dr. Jerome Barakos' qualification to testify

to the damage to Reinert's spine at the C5-6 level, to speak about any injury caused by

surgeries performed by Dr. Allen Heller, and to opine whether Reinert would need

surgery at this level in the future. Nevertheless, Dr. Barakos based his opinion on twenty-five years of experience in reviewing imaging studies and the impact of degenerative changes in the spine. As a radiologist, he works in the only specialty authorized to interpret anatomical images. Barakos reviewed the images of Reinert's spine. He should be able to determine whether damage to a cervical level can increase with additional degeneration.

*Issue 6: Whether Dr. Jerome Barakos presented irrelevant testimony?*

*Answer 6: No.*

Artie Reinert characterizes Dr. Jerome Barakos' testimony as irrelevant medical gobbledygook. When parsing the argument, we isolate two instances that Reinert specifically contends Barakos presented irrelevant testimony. First, Barakos testified: "But when you're in the operating room, you don't have this information [degenerative diseases that can be seen on an MRI, but not a fluoroscopy]." CP at 184. Second, Barakos testified that Dr. Allen Heller's surgeries left no physical injury to Artie Reinert's spinal cord.

We deem both snippets of testimony relevant. Dr. Heller defended the suit in part on the difficulty to determine, in the operating room, the targeted level by the use of C-Arm fluoroscopy. Dr. Jerome Barakos' testimony directly related to this defense. Artie Reinert complained about a dura tear caused by Dr. Heller during the second surgery.

40

Barakos' testimony about his review of the imaging and whether the imaging showed

permanent injury responded to Reinert's complaint.

ER 402 declares:

> All relevant evidence is admissible, except as limited by
> constitutional requirements or as otherwise provided by statute, by these
> rules, or by other rules or regulations applicable in the courts of this state.
> Evidence which is not relevant is not admissible.

In turn, ER 401 defines "relevant evidence:"

> "Relevant evidence" means evidence having any tendency to make
> the existence of any fact that is of consequence to the determination of the
> action more probable or less probable than it would be without the
> evidence.

To be relevant evidence must (1) tend to prove or disprove the existence of a fact, and (2)

that fact must be of consequence to the outcome of the case. *Davidson v. Municipality of*

*Metropolitan Seattle*, 43 Wn. App. 569, 573, 719 P.2d 569 (1986).

The threshold to admit relevant evidence is low; even minimally relevant evidence

is admissible. *Kappelman v. Lutz*, 167 Wn.2d 1, 9, 217 P.3d 286 (2009); *Mutual of*

*Enumclaw Insurance Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 729, 315 P.3d 1143

(2013). Evidence tending to establish a party's theory, or to qualify or disprove the

testimony of an adversary, is relevant evidence. *Lamborn v. Phillips Pac. Chemical*

*Co.*, 89 Wn.2d 701, 706, 575 P.2d 215 (1978); *Hayes v. Wieber Enterprises, Inc.*, 105

Wn. App. 611, 617, 20 P.3d 496 (2001). Relevant evidence embraces even facts which

offer only circumstantial evidence of any element of a claim or defense. *Davidson v.*

41

*Municipality of Metropolitan Seattle*, 43 Wn. App. 569, 573 (1986); 5 KARL B.

TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 83 (2d ed. 1982).

> *Issue 7: Whether Dr. Jerome Barakos presented cumulative testimony?*

> *Answer 7: Probably, but the trial court did not err in allowing the testimony.*

Dr. Jerome Barakos testified that imaging showed no neurological damage to Artie

Reinert's cervical spine after Dr. Allen Heller's three surgeries on Reinert. Artie Reinert

complains that this testimony repeated opinions of Dr. Allan Hamilton and Dr. Allen

Heller. We agree that Dr. Barakos' testimony repeated testimony of Allan Hamilton and

Allen Heller, but we note that Barakos' testimony provided more insight into the

conclusion of no harm. Barakos, the only testifying neuroradiologist, stated, unlike other

witnesses, that the imaging confirmed an absence of damage. This variance alone leads

us to conclude the trial court did not abuse its discretion when permitting the testimony of

Jerome Barakos.

> *Issue 8: Whether the trial court should have excluded testimony of Dr. Jerome*
>
> *Barakos under ER 403?*

> *Answer 8: No. The trial court did not abuse its discretion in allowing*
>
> *admissibility of Dr. Barakos' testimony.*

Finally, Artie Reinert raises the catch-all evidence rule, ER 403, to assert that the

trial court erred in allowing testimony from Dr. Jerome Barakos. ER 403 reads:

Although relevant, evidence may be excluded if its probative value
is substantially outweighed by the danger of unfair prejudice, confusion of
the issues, or misleading the jury, or by considerations of undue delay,
waste of time, or needless presentation of cumulative evidence.

ER 403 allows relevant evidence to be excluded when the danger of unfair

prejudice substantially outweighs its probative value. *State v. Barry*, 184 Wn. App. 790,

801, 339 P.3d 200 (2014). Trial courts have considerable discretion to consider the

relevancy of evidence and to balance the probative value of the evidence against its

possible prejudicial impact. *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987). A

decision to admit or exclude evidence is reviewed for an abuse of discretion. *City of*

*Kennewick v. Day*, 142 Wn.2d 1, 5, 11 P.3d 304 (2000). Because of the trial court's

considerable discretion in administering ER 403, reversible error is found only in the

exceptional circumstance of a manifest abuse of discretion. *State v. Gould*, 58 Wn. App.

175, 180, 791 P.2d 569 (1990). For the same reasons that we conclude that the testimony

of Dr. Jerome Barakas did not violate any other evidence rule, we rule that the trial court

did not abuse its discretion when denying Artie Reinert's motion to exclude testimony

under ER 403.

### Attorney Misconduct

Artie Reinert next complains of misconduct by Dr. Allen Heller's counsel when

counsel failed to assure the redaction of prejudicial testimony subject to the trial court's

orders in limine from Dr. Jerome Barakos' preservation deposition video prior to being

presented to the jury. The trial court ordered the redaction of testimony of Dr. Barakos that literature showed that fifty percent of surgeons have conducted a wrong level surgery and that Dr. Heller complied with the standard of care. Contrary to the court's order in limine, Dr. Heller played those portions of Dr. Barakos' deposition to the jury. Artie Reinert also contends that defense counsel, when questioning witnesses, repeatedly misstated the law on the physician standard of care by reference to a community or community hospital standard of care. In addressing these assignments of error, we must first determine if Reinert properly preserved an appellate challenge.

*Issue 9: Whether this court should review Artie Reinert's assignment of error with regard to the failure to redact testimony that fifty percent of surgeons have conducted a wrong level surgery when Reinert did not object at the time of the playing of the deposition?*

*Answer 9: No, at least because Reinert did not object within a reasonable time or seek a remedy due to the violation.*

Dr. Allen Heller contends that Artie Reinert failed to preserve error as to the playing of testimony about other neurosurgeons performing surgery at the wrong spinal level. At the time of the playing of this testimony, Reinert did not object or mention that the testimony violated the order in limine. Reinert responds that he did not need to object to preserve his challenge to evidence offered in violation of an order in limine.

Artie Reinert advances *State v. Brooks*, 20 Wn. App. 52, 59-60, 579 P.2d 961 (1978) for the rule that erroneous evidence offered in violation of an order in limine does not require an objection to preserve the issue on appeal. He further argues that, had objections and a request for curative orders been made, the objections would have further highlighted the erroneous testimony before the jury. *State v. Smith*, 189 Wash. 422, 65 P.2d 1075 (1937), in addition to *State v. Brooks*, supports this rule.

The Washington Supreme Court also addressed this question in *Fenimore v. Donald M. Drake Consruction Co.*, 87 Wn.2d 85, 549 P.2d 483 (1976). The plaintiff assigned error to the admission of the evidence that he had sought to exclude during a pretrial motion in limine. The trial court denied the pretrial motion on the basis that it needed to hear some of the evidence before making a ruling, but the court advised the plaintiff to object as the evidence was offered, at which time the court would be in a proper position to rule upon its admissibility. Later when the defense offered the evidence, plaintiff did not object. On appeal, the plaintiff argued he need not have objected at the time of the admission of the evidence to raise the issue on appeal because of his pretrial motion in limine. The Supreme Court disagreed because the trial court had directed plaintiff to object again during trial. In dicta, the court noted that, had the trial court granted the pretrial motion, the plaintiff need not have objected at the time of the admission of the evidence because, under the rule of *State v. Smith*, 189 Wash. 422

(1937), no objection was needed to preserve the right to claim error if the evidence was nevertheless admitted.

Since *Fenimore v. Donald M. Drake Consruction Co.*, this court has twice ruled contrary to *State v. Smith*. *A.C. ex rel. Cooper v. Bellingham School District*, 125 Wn. App. 511, 105 P.3d 400 (2004); *State v. Sullivan*, 69 Wn. App. 167, 847 P.2d 953 (1993). The court, in *A.C. ex rel. Cooper v. Bellingham School District*, merely followed the ruling and reasoning in *State v. Sullivan* without deep analysis.

In *State v. Sullivan*, James Sullivan argued on appeal that the prosecutor elicited evidence placing him in a high risk category of sexual offenders in violation of an order in limine. This court ruled that, even if the prosecuting attorney violated the order in limine, Sullivan had failed to preserve the violation for appeal. The court noted the general rule that a litigant cannot remain silent as to a claimed error during trial and later urge error on appeal. Nevertheless, when the litigant advanced the issue below, giving the trial court an opportunity to rule on relevant authority, and the court so rules, the litigant may not need to object at the time of admission of the claimed erroneous evidence in order to preserve the issue for appeal. A motion in limine presents an opportunity for the trial to rule on admissibility of evidence. If the trial court denies the motion in limine, the party losing the motion has a standing objection. After reviewing Washington case law, the court concluded that only the party who lost the motion to exclude evidence merits the standing objection. Sullivan received a favorable ruling and

the State arguably violated it. Unlike when the trial court denies the motion in limine, the issue is not whether the order in limine was proper in the first instance. The issue becomes whether the State violated the order in limine, and if so, what remedy to impose. The trial court deserves the opportunity to determine if the opposing party violated the order, if any violation caused prejudice, and the steps to take to rectify the harm. Otherwise, the complaining party could simply do nothing, gamble on the verdict, and then seek a new trial on appeal. Since James Sullivan failed to notify the trial court of any claimed violation, he failed to preserve error for appeal.

This court, in *State v. Sullivan,* noted the Supreme Court's pronouncement, in *Fenimore v. Donald M. Drake Construction Co.*, 87 Wn.2d 85, 92 (1976), that, when the trial court grants the appellant's motion to exclude evidence, no objection is necessary to preserve the right to claim error if the evidence was nevertheless admitted. The *Sullivan* court also observed that the *Fenimore* court cited *State v. Smith*, 189 Wash. 422 (1937), for its pronouncement. Nevertheless, the court, in *State v. Sullivan*, wrote that the *Fenimore* pronouncement was dictum, since the trial court did not grant but denied the motion in limine and advised the appellant to object as the evidence was offered.

This court, in *State v. Sullivan*, also discussed *State v. Smith*. In *Smith*, the defendant, a former deserter from the United States Marine Corps, was charged with two counts of assault that allegedly occurred while he was employed by management as a private guard during a tense labor-management dispute. The trial court, in response to

47

the defendant's pretrial motion to exclude any reference to the desertion, ordered that the State first seek the trial court's permission before injecting, on cross-examination, the manner in which the defendant left the Marine Corps. The State ignored the court ruling, and the defense failed to object to the evidence. The trial court denied the defendant's motion for a new trial because no objection was made to the evidence when offered. The Supreme Court reversed the trial court. The Supreme Court ruled that the absence of an objection did not control, because an objection, even if sustained, would cause more damage than almost any answer. In view of the State's deliberate disregard of the court's ruling, the Supreme Court ruled that prejudice must be presumed and a new trial should have been given.

This court, in *State v. Sullivan*, distinguished *State v. Smith*. James Sullivan failed to demonstrate that the State deliberately disregarded the trial court's ruling or that an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court. This court held that, in the absence of any unusual circumstance that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible, the complaining party at the time must make a proper objection in order to preserve the issue for appeal.

We agree with this court's reasoning, in *State v. Sullivan*, that a party who wins a motion in limine should immediately notify the trial court of a claimed violation of an order in limine. Nevertheless, we question whether the *Sullivan* court possessed the

prerogative to ignore the ruling in *State v. Smith* despite the circumstances in each decision being disparate. *State v. Gore*, 101 Wn.2d 481, 681 P.2d 227 (1984). Regardless, we conclude that the party claiming the violation of an order in limine must within a reasonable time, during trial, notify the trial court of the alleged breach and seek a remedy before asking for a new trial for the first time on appeal. The complaining party must also show some prejudice. As to the testimony about other neurosurgeons performing surgery at the wrong spinal level, Reinert never sought a remedy or claimed prejudice during the trial court proceedings.

*Issue 10: Whether this court should grant Artie Reinert a new trial because of defense counsel's failure to redact Dr. Jerome Barakos' testimony on the standard of care?*

*Answer 10: No.*

Artie Reinert timely objected to Dr. Jerome Barakos' deposition testimony as to the standard of care. The trial court then stopped the video and issued an instruction to the jury to disregard the question and answer.

Artie Reinert argues on appeal that, although not an intentional act, this court should determine that the playing of the testimony amounted to constructive misconduct. Reinert contends that, in this current digital age, trial attorneys should be held accountable for making redactions required by the trial court before playing video testimony before a jury.

A new trial may be granted based on the prejudicial misconduct of counsel if the movant establishes that the conduct complained of constitutes misconduct and not mere aggressive advocacy and that the misconduct is prejudicial in the context of the entire record. *Aluminum Co. of America v. Aetna Casualty & Surety Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000). The movant must have properly objected to the misconduct, and the misconduct must not have been cured by court instructions. *Aluminum Co. of America v. Aetna Casualty & Surety Co.*, 140 Wn.2d 517, 539 (2000). A jury is presumed to follow the court's instructions. *State v. Hepton*, 113 Wn. App. 673, 685, 54 P.3d 233 (2002). A mistrial should be granted only when nothing the trial court could have said or done would have remedied the harm done to the defendant. *Aluminum Co. of America v. Aetna Casualty & Surety Co.*, 140 Wn.2d at 539. Attorney misconduct includes an attorney's attempts to violate the rules of evidence by placing inadmissible or irrelevant evidence before the jury. *Teter v. Deck*, 174 Wn.2d 207, 223-24, 274 P.3d 336 (2012).

Artie Reinert acknowledges that the alleged misconduct was unintentional. Reinert provides no citation to legal authority that this court should determine that the conduct of counsel amounts to "constructive misconduct."

Dr. Allen Heller argues that, rather than attorney misconduct, the issue before this court is an unintended trial irregularity. *See e.g.*, *State v. Young*, 129 Wn. App. 468, 472-73, 119 P.3d 870 (2005). Under this standard, this court examines the following:

50

> (1) the seriousness of the irregularity; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it.

*State v. Young*, 129 Wn. App. at 473.  Absent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect.  *A.C. ex rel. Cooper v. Bellingham School District*, 125 Wn. App. 511, 524 n.37, 105 P.3d 400 (2004).

Dr. Allen Heller cites to *State v. Jones*, 144 Wn. App. 284, 183 P.3d 307 (2008), in which this court held that the inadvertent playing of a body wire recording did not constitute prosecutorial misconduct.  This court reasoned that the prosecutor did not commit the conduct in flagrant disregard of the trial court's ruling.  We follow the ruling in *State v. Jones*.  We also emphasize that Artie Reinert waited until the appeal to seek a new trial.

We deem the violation by counsel serious, but note that the offending testimony was cumulative.  Dr. Jeffrey Larson testified that a wrong level surgery did not constitute a violation of the standard of care.  Dr. Sigurd Berven also opined that a complication during surgery does not constitute a violation of the standard of care as one could not guarantee a surgical outcome.

Artie Reinert complains about the strength and sternness of the trial court's curative instruction. Nevertheless, he posed no alternative instruction during trial. Regardless, the trial court instructed the jury to ignore the testimony.

Despite our ruling, we express dismay at the playing of videotape testimony ruled inadmissible by the trial court. The trial court ordered only a few excerpts redacted. We know of no excuse for the videotape company to have failed to properly follow the trial court's direction. We know of no excuse as to why defense counsel should not have reviewed the videotape to confirm that the ordered excisions occurred.

*Issue 11: Whether this court should grant Artie Reinert a new trial because defense counsel referenced a community hospital standard during questioning of witnesses?*

*Answer 11: No.*

Next Artie Reinert argues that Dr. Allen Heller's counsel knew that a "community hospital" standard of care conflicts with the standard of care outlined in RCW 7.70.040. Reinert argues that counsel repeatedly misstated the law by referencing this standard and such references should also be considered constructive misconduct.

Artie Reinert objected once to Dr. Allen Heller's counsel's reference to the community on the basis that a community hospital was not relevant to the standard of care. The trial court overruled the objection. Dr. Jeffrey Larson then requested that counsel rephrase. The final question ultimately posed removed all reference to a

community hospital.  Thus we reject Reinert's contention that counsel's reference to community in this instance amounted to prejudicial misconduct.

Cumulative Error

*Issue 12: Whether this court should grant Artie Reinert a new trial because of cumulative error?*

*Answer 12: No.*

Artie Reinert contends that the cumulative effect of his asserted grounds for reversal warrant the granting of a new trial.  The cumulative error doctrine applies when a combination of trial errors denies the accused a fair trial, even when any one of the errors, taken individually, would be harmless.  *In re Personal Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014)*, abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018).  The doctrine does not apply when the errors are few and have little or no effect on the outcome of the trial.  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  In *Rookstool v. Eaton*, 12 Wn. App. 2d 301, 311, 457 P.3d 1144 (2020), this court held that civil litigants should be ensured a fair trial and, therefore, the cumulative error doctrine applies to civil cases as well as criminal cases.

The playing of Dr. Barakos' testimony on the standard of care was error.  Nevertheless, this error, as discussed above, did not impact the outcome on the jury's verdict.  Artie Reinert's other alleged errors do not constitute grounds for reversal.

CONCLUSION

We affirm the jury's verdict and the trial court's judgment in favor of the defense.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Lawrence-Berrey, J.